### In re BAGEL BROS BAKERY & DELI, INC., Debtor.

### In re R & J Holdings of Buffalo, Inc., Debtor.

### In re Bagel Brothers Maple, Inc., Debtor.

### Nos. 98–11441, 98–11442, 98–11443.

United States Bankruptcy Court, W.D. New York.

April 3, 2001.

---

William F. Savino, Robert J. Portin, of counsel, Damon & Morey, Buffalo, New York, for debtors.

Gabriel Ferber, Nesper, Ferber & Di-Giacomo, Amherst, New York, for Ohio Farmers.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This is a debtor's objection to a claim. It is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

The novel question presented here is whether two brothers were so successful in marketing their trade name—"The Bagel Brothers"—that each of the various companies that they owned and controlled and that did business as a "Bagel Brothers" company must be held liable on a debt to a trade supplier who justifiably relied on the credit of the "Bagel Brothers" and who was never told that it was the brothers' intention that only certain of their corporations were to be obligated on the debt— those being the corporations to which the supplies and provisions were directed to be delivered. The Court holds that the brothers did indeed oblige all of the companies they controlled that did business in the "name and style" of the "Bagel Brothers" or the "Bagel Brothers Companies." This result is drawn from the case of *Seymour v. Western Railroad Co.*, 106 U.S. 320, 1 S.Ct. 123, 27 L.Ed. 103 (1882), as explained below. To be candid, that is the sole case authority (with some support by authorities cited by the creditor) for what appears to be the correct result. (As noted, the question is a novel one.)

## BACKGROUND

For more than 20 years, as of 1993, brothers Robert and Jay Gershberg had grown a local chain of bagel shops called "Bagel Bros." Their ubiquitous radio ads depicted "Bagel Bob" and "Bagel Jay," and sometimes their mother. For years they dominated that niche market in this locality—Buffalo, New York. No larger chains challenged them in this market, but non-niche competitors (supermarkets, for example) had made inroads into the bagel business here.[1]

At all relevant times, they did business through a number of corporations. One

---

1. This was not adduced at the hearing on this specific claim. It is in the nature of Chapter

corporation owned a "commissary" that was a central processing and distribution facility for fresh bagel dough, dairy spreads, sandwich meats, and other necessities for the chain of retail outlets in malls, etc. Another corporation provided administrative services for yet other corporations each of which owned one or more individual stores. There was no single "holding company" or "parent" corporation. (Debtor R. & J. Holdings of Buffalo, Inc. was incorporated much later than the events in question, solely for the purpose of a strategic Chapter 11 filing, as described later.) The words "Bagel Bros." were included in the name of each corporation. For example, "Bagel Bros. Maple, Inc." owned all but one of the stores and "Bagel Bros. Bakery and Deli, Inc." owned one store.

In 1993, the Bagel Brothers decided to test the Cleveland, Ohio market, a four-hour drive from Buffalo. They approached a major supplier of dairy and other products in that locality, Ohio Farmers, asking it to supply their later-to-be-opened Ohio stores on favorable credit terms. They invited Ohio Farmers to check-out the good will and credit reputation of the "Bagel Bros." business in Buffalo. Ohio Farmers did so and received highly favorable reports. Ohio Farmers agreed to extend more favorable credit terms to the "Bagel Bros." than they did to less-credit-worthy customers. Notably, Ohio Farmers did not insist on a personal guaranty from the Gershbergs.

As the various stores were opened, the brothers ordered product to be "delivered" to "Bagel Bros. Shaker Heights, Inc." or to some other Ohio corporation operating a particular store.. But Ohio Farmers was always instructed to "bill" to "Bagel Bros." at a Buffalo-area address. Again, Ohio Farmers was always instructed to "deliver" to the various Ohio corporations and to "bill" "Bagel Bros." in Buffalo. The fact is that there was no "Bagel Bros." or "Bagel Brothers," etc. company in Buffalo or anywhere. It was just a logo or "style," or "d/b/a" or a/k/a.

The evidence provided in the form of Robert Gershberg's testimony suggests that Ohio Farmers invoices were paid with checks drawn on accounts in the name of the respective Ohio corporations, though no documentary evidence was offered in that regard. The "in-house" bookkeeping by the brothers as among the corporations was meticulous and respected the separateness of the corporations.[2] Ohio Farmers had delivered and been paid for much product.

Ultimately, the Ohio stores were not successful and were closed, leaving a $37,000 debt outstanding to Ohio Farmers.

During the above-described period, the Gershbergs were in the process of selling their ownership of their bagel business to a larger bagel chain—Manhattan Bagel Company. Incident to that process, the "Bagel Brothers" stores had become Manhattan Bagel-brand stores, owned by the various "Bagel Bros." corporations as franchisees. The Ohio stores apparently were always "Manhattan Bagel" stores, in the eyes of the retail public.

Certain possible securities law problems led to a Chapter 11 filing in New Jersey

---

11 cases that the Court gains familiarity with facts that are presented in proceedings other than the specific matter at Bar. This writer had presided over 20 days or more of trial, or other matters in this case, before this objection to claim was heard.

2. See footnote 1. There had been an early challenge to the management fees charged by Bagel Bros. Amherst, Inc. (which was not a debtor in this court) to each of the other corporations and there was undisputed testimony to this effect.

by Manhattan Bagel. This happened in the midst of a dispute between the Gershbergs and Manhattan Bagel Co. regarding completion of the buyout of the Gershbergs' interest. To combat certain demands made by Manhattan Bagel Co., the Gershbergs undertook a strategic Chapter 11 filing here of "Bagel Bros. Maple, Inc." and "Bagel Bros. Bakery and Deli, Inc." They also incorporated "R. and J. Holdings" to hold the ownership interest to all the corporations, so that that company could file under Chapter 11 too, and protect the stock without the need for the Gershbergs to file personally. At that time, Bagel Bros., Maple, Inc. owned all of the Buffalo-area stores, and those stores and the support services provided by the brothers' various entities had a value vastly in excess of the claims of all creditors other than the certain claims that Manhattan Bagel had elected to assert as "creditor" claims against the Debtors instead of ownership claims against the Gershbergs.

Eventually, a settlement was reached here among the Gershbergs (who have never personally sought relief here), their debtor and non-debtor corporations, and Manhattan Bagel Co., resolving all their differences. Manhattan Bagel now owns all the bagel business assets previously owned by the Gershbergs and their various corporations. All valid claims against Bagel Bros. Maple, Inc. have been or will be paid in full, as part of the settlement.

Ohio Farmers has filed its claim against "Maple" (as it is called here). Ohio Farmers has never expressly done business with Maple, but while the assets of Maple are sufficient to pay all valid claims, the Ohio corporations have never filed for relief under Title 11 because, apparently, they are assetless and moribund. Ohio Farmers has not sued the Gershbergs, presumably because there has never been any doubt that they acted only as agents for some corporate entity or entities. There is no claim in this Court that they personally deceived or defrauded Ohio Farmers.

## THE PARTIES' ARGUMENTS

The question is whether Ohio Farmers has a claim against Maple—a corporation it knew nothing about and with which it never knowingly dealt.[3]

After an evidentiary hearing, the Court ruled that Ohio Farmers was justified in believing that its obligor was something known as "Bagel Brothers" or the "Bagel Brothers' Companies," located in Buffalo, rather than the particular corporations in Ohio to which Ohio Farmers was directed to deliver the product. The Court ordered briefing of the legal effect of this finding.

Maple, in its brief, largely ignores the finding and argues that Ohio Farmers knew only of the various Ohio corporations and cannot look to Maple.

Ohio Farmers, in its brief, likens the moniker "Bagel Brothers" to a *de facto* legal entity—what Ohio Farmers calls a "friendly octopus" whose *de jure* entities (the various corporations) are the tentacles. Ohio Farmers accuses the brothers of marshaling the value of its enterprise into the Buffalo tentacles and telling Ohio Farmers to look only to the dead tentacles in Ohio.

Maple responds that the Bagel Brothers simply did what the separateness of corporations permits—limit liability.

---

3. Creditors of Maple have been or will be paid in full. Though there are exceptions, such questions rarely have a different answer when insolvency pits the creditor against other creditors of a debtor. See *In re Cardon*

*Realty Corp.,* 146 B.R. 72 (Bankr.W.D.N.Y. 1992) to the effect that a debtor's prepetition errors and foibles are often visited upon its creditors.

Pressed by the Court for citations of authority for its argument, Ohio Farmers offers several theories.

Theory 1. The Gershbergs' conduct established a *de facto* legal entity known as "Bagel Brothers" or the "Bagel Brothers Companies." That *de facto* entity should be likened to an individual who does not disclose to a supplier that he is going to set up a corporation and that it is his intent to act only as agent for the corporate principal. *Tarolli Lumber Co. v. Andreassi*, 59 A.D.2d 1011, 399 N.Y.S.2d 739 (4th Dept.1977). Just as such an individual would be personally liable, Maple should be liable because the Gershbergs caused Maple regularly to hold itself out (in the public eye, in its letterhead, and in Court) as "Bagel Brothers" or as the "Bagel Brothers Companies." In other words, if the Gershbergs wanted to limit Maple's liability, it was their duty to be careful to distinguish among their corporations in their dealings with the outside world. Ohio Farmers had no duty to investigate and ferret-out who the Gershbergs intended to be liable, given that the Gershbergs so boldly and recklessly (from the perspective of Maple) portrayed their holdings as a unified entity.[4]

Theory 2. Maple violated New York law by doing business as "Bagel Brothers" and "Bagel Brothers Companies," when in fact its corporate name is "Bagel Brothers Maple, Inc." and it never recorded its "assumed name" with the Secretary of State. N.Y.Gen.Bus. § 130 (McKinney 1988 & Supp1999–2000). Thus it is liable to a creditor who, as the Court has ruled, is justified in believing that "Bagel Bros." or the "Bagel Brothers Companies" was the obligor.

Theory 3. There were significant financial dealings between Maple and one or more of the Ohio corporations, and at least one loan of over $100,000 was repaid to Maple by one of the Ohio corporation to which Ohio Farmers had delivered product without payment. Equity would direct that Ohio Farmers be paid by Maple, which is the "tentacle" in which almost all of the value of the Octopus ended up.

Ohio Farmers rounds out its arguments by asserting that not just Maple, but all of the Gershbergs' companies that comprised the "Bagel Brothers Companies" are liable, and Maple is free to seek contribution from the others. Ohio Farmers' bargain was with the whole of the Gershbergs' enterprise because the Gershbergs held the enterprise out as one enterprise[5] in their dealings with Ohio Farmers.

Maple, as noted above, largely ignores the Court's finding that Ohio Farmers was justified in believing that it had contracted with "Bagel Brothers" or the "Bagel Brothers Companies." So Maple cites cases setting forth standards for "piercing the veil" of the separateness of corporate entities, and "alter ego" cases. As Ohio Farmers emphasizes, that is not the issue here. This is not a question of whether Ohio Farmers could hold Maple liable because the Ohio corporations were liable or because the Gershbergs might personally be liable. In this case, as the Court has already held, the Ohio corporations were expressly specified by the Gershbergs to receive the goods, but it was "Bagel Bros." in Buffalo, that was specifically designated by the Gershbergs to be billed. What was to be briefed is "What does that finding mean as a matter of law?"

Ohio Farmers was never told of any particular corporation which was to be its

4. *Id.*

5. The fact that one enterprise can be made up of separate entities is clear, such as where there is vertical integration of corporations.

obligor. Indeed, Ohio Farmers had been told by the Gershbergs at the outset to rely on the reputation of their entire enterprise in Buffalo, in deciding whether to extend terms to "them"—the Bagel Brothers. Although it is clear that Ohio Farmers knew of the Ohio corporations and delivered to them, and might have seen payment of their invoices by checks drawn on accounts in the names of the various Ohio corporations (as was suggested by the testimony of Robert Gershberg), there is not a scintilla of evidence to suggest that Ohio Farmers was told or otherwise led to believe, until *after* Maple's Chapter 11 filing, that it was only the Ohio corporations that were to be liable. After that filing, Ohio Farmers' attorney wrote to "Bagel Brothers" in reference to Ohio Farmer's distinct claims against distinct Ohio corporations. It is not surprising that an attorney would take the path of least resistance until being told that those corporations are broke and that the Gershbergs were not going to simply write checks or cause Maple or R & J Holdings or Bakery and Deli to write checks.

Maple's first five arguments all ignore the Court's finding of fact, and are, thus, rejected.

Only in its last argument does Maple address the issue before the Court. It does so by challenging Ohio Farmers' arguments. It points out that no case squarely supports Ohio Farmers, and it

offers argument as to why the extensions and analogies argued—for by Ohio Farmers would be error or unwarranted under the facts.

## DISCUSSION

It is not surprising that no cases directly on point have been found. In this writer's experience, business people who control more than one corporation fall into two categories, not three. They either strictly maintain the corporations' separateness or they utterly disregard it. The case reporters are full of decisions regarding both of these categories—they are the cases cited in Maple's brief.[6]

Here we have a confluence of two odd circumstances. First, the usual case is one in which the creditor seeks to hold liable the people it dealt with, not a corporation it never dealt with, but that is owned by those people.[7] Secondly, we have here a case in which corporate principals were so successful in having built-up good will in an unregistered trade "style" or "logo"— one that was common to almost all their corporations—that they regularly *chose to do* business as *that style or logo* without regard to whether that might expose all of the corporations that they meticulously otherwise kept separate when "in-house," for tax and other important reasons.

With the exception of banks, landlords, and the government, it is possible that no

---

6. Persons who do not control companies, but who just work for one affiliated company are a different matter. They do not typically respect the separateness. Thus, for example, this writer heard more than twenty days of claims objections—many hundreds of objections—in a case in which swimming pool salespersons had regularly "mixed and matched" purchase order forms, etc. without regard to which of several related companies performed what functions, or made what promises.

7. In the ordinary case, one who has a claim against A, may not jump to asserting a claim against B, which is owned by A. Rather, the claim must be prosecuted against A, and pre- or post-judgment remedies against B are a separate matter. B is a potential source of satisfaction of a judgment against A. B is not a proper party-defendant *in substitution for A.* But this is not the ordinary case. Here it is asserted that every B or C or X, etc. owned by A and doing business under the name and style that A did business under is a proper party defendant.

one with whom the "Bagel Brothers Companies" had dealings ever knew or ever cared which company was on the other side of the purchase, the account, the paycheck, etc. The Gershbergs clearly were agents possessing the capacity and authority to bind all of their "Bagel Bros." companies.

And it is this Court's holding that that is precisely what they did in this case where they not only held their bagel business out to Ohio Farmers as a unified *de facto* entity with power to bind all of its subsidiaries, but neglected to tell Ohio Farmers that (1) there in fact is no *de jure* single entity and so (2) do not just deliver to the Ohio corporations, but also bill each of them "care of" Bagel Bros. Maple, Inc. or "care of" whatever other entity was performing accounts-payable services for the Ohio corporations.

If there were a *de jure* holding company named "Bagel Bros. Companies, Inc." with power to bind all of its affiliates, including Maple, there could be no doubt that Maple would be bound here by the Gershbergs, acting through that holding company. Or at the least, the holding company and the Gershbergs would be equitably estopped from *causing Maple* to claim otherwise.

The result should not be different where the Gershbergs led potential trade creditors[8] reasonably to believe that there was such a *de jure* entity or consolidation.

By their conduct toward Ohio Farmers, toward the public, on their letterhead and otherwise, they created such an entity or consolidation *de facto*. (See Trial Exhibit marked "Deft's C" dated 1/25/01—memorandum received by Ohio Farmers advising of the new corporate headquarters address which used the "Bagel Bros. Companies'" logo; Trial Exhibits marked "Deft's A–1" through Deft's A–10 dated 1/25/01 all of which "bill to" the Bagel Bros. Companies corporate headquarters addresses.) The separateness of corporations is provided as a shield, not a sword. The separateness of Maple may not be asserted when the only reason is it is not obviously bound is the conscious decision by its owners to choose not to *de jure* create the intermediary entity—"Bagel Brothers" or "The Bagel Brothers Companies"—in whose name they conducted business.[9]

In sum, this case is about a state of confusion caused by Maple's principals, and they may not be heard to benefit from their own wrong. Ordinarily, that would not be visited upon Maple (or its other creditors), but by some time in 1995, it owned nearly all the Buffalo stores. Even in 1993, Maple was one instrumentality by which the Gershbergs could enjoy the reputation upon which it obtained credit from Ohio Farmers. But more importantly, it is the entity into which virtually all value of the brothers' bagel business eventually flowed.

This writer knows not whether the question is novel because there are no reported cases directly in point, or whether there are no reported cases in point because the facts are unique. But, in the Court's view, this is the "flip side" of *Seymour v. Western Railroad Co.*, 106 U.S. 320, 1 S.Ct. 123, 27 L.Ed. 103 (1882), wherein the Supreme Court held that several persons who described themselves as "copartners

---

8. Trade creditors are not lenders, landlords, or the government. They "hustle" for accounts, often against stiff competition. Rarely can they pick and choose their customers on the basis of financial statements.

9. See *In re Albion Disposal, Inc.*, 152 B.R. 794 (Bankr.W.D.N.Y.1993) in which this Court refused to honor a decision not to document a relationship between an individual and his corporations, that existed in fact.

trading in the name and style of S. Seymour & Company" were entitled to maintain an action in their individual names against the other contracting party even though none of the individuals were named in the contract. "It is not necessary that all of them should be named in the contract," said the High Court, adding, "it is sufficient that they are so described therein that they can be identified." *Id.* at 321, 1 S.Ct. 123. In the agreement, Mr. Seymour purported to bind himself "and such parties as he may associate with him under the name of S. Seymour & Company." *Id.* at 320, 1 S.Ct. 123.

That case would be controlling if Maple were attempting to collect money from Ohio Farmers instead of vice versa because Ohio Farmers would not be able to claim that it does not know Maple. If all the Bagel Bros. companies sued Ohio Farmers, Ohio Farmers would have to pay. And the result should be the same in this case. The High Court having ruled that you can be held liable to one whose existence was unknown to you, because you agreed to be held liable by whomever associated with your privy on that job, it follows that one may hold liable everyone who associated with your privy on that job if (1) that was your privy's choice, and (2) your privy had the authority to find them all. They may seek contribution among themselves. The Gershbergs had the authority, and by their understandable pride in their trade "style," it was their choice to bind their various companies, inadvertent as it might have been.

### CONCLUSION

In directing Ohio Farmers to bill "Bagel Brothers" in Buffalo, the Gershbergs either intentionally or unintentionally bound whatever companies they controlled that "associated under the name Bagel Brothers or the Bagel Brothers companies," (in

the language of the *Seymour* case) for the purpose of the conduct of the bagel business, whether in Ohio or Buffalo. And for the reasons cited by Ohio Farmers in its brief, there was no duty on Ohio Farmers to investigate further and sort-through the confusion the Gershbergs caused.

The objection is overruled. The claim is allowed.

SO ORDERED.