**BAGEL BROTHERS MAPLE,
INC., Appellant,**

v.

**OHIO FARMERS, INC., Appellee.**

No. 01–CV–363C.

United States District Court,
W.D. New York.

March 1, 2002.

Damon & Morey LLP, Robert J. Portin, of counsel, Buffalo, NY, for Bagel Brothers Maple, Inc.

Nesper, Ferber & Digiacomo, LLP, Gabriel J. Ferber, of counsel, Amherst, NY, for Ohio Farmers, Inc.

## INTRODUCTION

CURTIN, District Judge.

In this bankruptcy appeal, filed pursuant to 28 U.S.C. § 158(a)(1), appellant Bagel Brothers Maple, Inc., seeks review of an order of United States Bankruptcy Judge Michael J. Kaplan, issued on April 3, 2001 and amended May 18, 2001, allowing a claim in favor of appellee Ohio Farmers, Inc., in Case No. 98–11443K (reported as *In re Bagel Bros. Bakery & Deli, Inc.*, 264 B.R. 260 (Bankr.W.D.N.Y.2001)). The parties have submitted briefs in support of their respective positions on appeal, and this court heard oral argument on November 9, 2001. For the following reasons, I find that the bankruptcy court's allowance of the claim was in error, and remand the case for further proceedings.

## BACKGROUND

The factual and procedural background of this case, set forth here in summary fashion, is discussed at length in Judge Kaplan's order[1] and in the parties' submissions. Much of the factual background is not in dispute. For several years, brothers Robert and Jay Gershberg owned and operated a local chain of bagel stores in the Buffalo, New York, area. Each Buffalo area store (eventually totaling fourteen) was owned either directly or indirectly by the Gershbergs, and was operated by a separate corporation under the trade name "Bagel Brothers." For example, Bagel Brothers Elmwood, Inc., operated a store on Elmwood Avenue. Bagel Brothers Transit, Inc., operated a store on Transit Road. Prior to 1995, Bagel Brothers Maple, Inc. ("Maple"), the appellant

here, operated a single store on Maple Road in Amherst, New York.

Beginning in 1993, the Gershbergs expanded their chain by opening nine new stores and a commissary in the Cleveland, Ohio, area. Each Ohio Bagel Brothers store was established and operated as a separate Ohio corporation. For example, Bagel Brothers Stow, Inc., operated a store in Stow, Ohio. Bagel Brothers Kent, Inc., operated a store in Kent, Ohio. Bagel Brothers Parma, Inc., operated a store in Parma, Ohio. Each of the individual Bagel Brothers corporations (now twenty-three in number) kept its own corporate minute books, stock books, and other business records, and at all times meticulously adhered to corporate formalities.

Appellee Ohio Farmers, Inc. ("Ohio Farmers"), is a major supplier of food and dairy products in the Cleveland area. During the expansion of the Bagel Brothers business into Ohio, the Gershbergs approached Ohio Farmers about the prospect of supplying food products to the Ohio Bagel Brothers stores on credit. Upon receiving favorable reports as to the good will and credit reputation of the Bagel Brothers business in Buffalo, Ohio Farmers agreed to supply the Ohio stores on advantageous credit terms. As the stores were opened, the Gershbergs directed Ohio Farmers to deliver products to the Ohio corporation operating the particular store, and to send the bill to the Bagel Brothers' corporate headquarters at 315 Alberta Drive, Amherst, New York. For each new store, Ohio Farmers generated a "New Account Form" indicating the corporate name, trade name, and address of the particular Ohio store, and the billing ad-

---

1. As noted in his April 3, 2001 order, Judge Kaplan's familiarity with the underlying facts was gained as a result of having presided over the proceedings from the outset of the Chapter 11 filings (in March 1998), including "over

20 days or more of trial, or other matters in this case, before this objection to claim was heard." *In re Bagel Brothers Bakery & Deli, Inc.*, 264 B.R. 260, 261 n. 1 (Bankr.W.D.N.Y. 2001).

dress in Amherst (*see* Exhs. A–1 through A–10).[2] Between 1993 and 1998, Ohio Farmers sold food products to the various Ohio stores, and invoices were paid by Bagel Brothers by checks drawn on accounts maintained in the names of the individual Ohio corporations.

Meanwhile, in 1995, all of the Bagel Brothers New York corporations were merged into Bagel Brothers Maple for administrative purposes, and the corporate headquarters of the "Bagel Brothers Companies" was moved from 315 Alberta Drive to a new location at 6000 North Bailey Avenue in Amherst (*see* Exh. E). Bagel Bros. Bakery & Deli, Inc., a Delaware corporation which operated the Bagel Brothers store located at the Northtown Plaza in Amherst, was not merged with the New York corporations and remained a separate entity.

In late 1995 and early 1996, the Gershbergs became engaged in discussions with representatives and principals of Manhattan Bagel Company, Inc., a larger bagel/deli chain interested in acquiring the Bagel Brothers business. After considerable negotiation, the transaction was consummated in June 1996 as a "structured acquisition" involving a total purchase price of $10,000,000.00, to be paid partly in cash and partly in the form of various stocks, securities, notes, and loan agreements (*see* Exh. 1). However, prior to completion of the buyout, Manhattan Bagel became involved in a securities law investigation which eventually led to Manhattan Bagel's filing of a Chapter 11 bankruptcy petition in New Jersey in November 1997.

As a result, in March 1998, the Gershbergs undertook a strategic Chapter 11 filing in the Western District of New York to protect against Manhattan Bagel's demands for return of a substantial portion of the purchase price already paid, and the severe devaluation of Manhattan Bagel stock yet to be tendered. Petitions were filed on behalf of Maple and Bagel Bros. Bakery and Deli, Inc. The Gershbergs also filed a petition on behalf of R & J Holdings of Buffalo, Inc., which was incorporated to protect the Gershbergs' Bagel Brothers stock holdings without the need for them to file personally.

The Ohio stores closed shortly after the Gershbergs' bankruptcy filings, leaving an unpaid debt to Ohio Farmers of approximately $34,000.00.[3] Ohio Farmers unsuccessfully sought payment from the asset-less Ohio corporations, and eventually filed a claim in Maple's Chapter 11 case. Maple objected to the claim, arguing that it could not be held liable for the debts of the Ohio corporations since it was a separate corporate entity with whom Ohio Farmers had never directly contracted. Maple also argued that the claim was barred by the New York Statute of Frauds, which renders void an oral promise to answer for the debt of another.

At the conclusion of a lengthy hearing on January 25, 2001, Judge Kaplan made the following oral findings:

> [A]ll of the evidence introduced by Ohio Farmers is to the effect . . . that it was reasonable of them to conclude that . . . [t]hey were to look to payment from a Buffalo entity, that they believed to be

**2.** Unless otherwise specifically noted, references to "Exh." are to the exhibits attached to the Record on Appeal.

**3.** The amount of the debt is stated at various points in record as falling somewhere be-

tween $38,000 and $35,000. In their "Appellee's Brief," Ohio Farmers states that the amount has been reduced by stipulation to $34,000 (Item 8, p. 3).

an entity known as Bagel Brothers, or as Bagel Brothers Companies.

... [T]he weight of [the] evidence is that ... the bills were to be sent to and paid by some Buffalo entity.

....

... It may have been Mr. Gershberg's intention to bestow upon [Ohio Farmers] the knowledge that it would be Ohio corporations that would be debited with the payment of these bills, which is to say that the money would come out of the Ohio corporations, ... but the clear weight of the evidence, in my view, is that Ohio Farmers was justified in believing that the party to be obligated, however it was debited in the non-corporate books, ... was some party named Bagel Brothers or Bagel Brothers Companies.

(Tr. at 153–54.)[4] Judge Kaplan concluded: "There is no entity ... called Bagel Brothers Company or Bagel Brothers, period." (Tr. 156.) The Judge directed the parties to submit briefs as to the legal effect of these findings, stating the question to be briefed as follows:

[T]he extent ... to which one binds corporations that one controls and on whose behalf one has authority to act when one deals with potential creditors, trade creditors, using a generic or a trade style, whether it be licensed or otherwise, that is common to the title of each of the corporations that one controls and on whose behalf one acts.

(Tr. 152.)

On April 3, 2001, Judge Kaplan issued his decision allowing Ohio Farmers' claim against Maple. The Judge began by framing the dispute as follows:

The novel question presented here is whether two brothers were so successful in marketing their trade name—"The Bagel Brothers"—that each of the various companies that they owned and controlled and that did business as a "Bagel Brothers" company must be held liable on a debt to a trade supplier who justifiably relied on the credit of the "Bagel Brothers" and who was never told that it was the brothers' intention that only certain of their corporations were to be obligated on the debt—those being the corporations to which the supplies and provisions were directed to be delivered.

*In re Bagel Brothers,* 264 B.R. at 261. The Judge rejected Maple's reliance on cases dealing with the legal theories of "piercing the corporate veil" and "corporate alter ego" as methods of disregarding the corporate form, since this approach ignored his previous finding that Ohio Farmers was justified in believing it had contracted with an entity known as Bagel Brothers in Buffalo. *Id.* at 264. Judge Kaplan focused instead on the conduct of the Gershbergs as "agents possessing the capacity and authority to bind all of their 'Bagel Bros.' companies." *Id.* at 266. The Judge found that, by their conduct toward Ohio Farmers and toward the public in general, the Gershbergs created a *de facto* entity or consolidation of entities sufficient to bind Maple to the debts left unpaid by the Ohio corporations. *Id.*

The Judge viewed the legal question presented as the "flip side" of *Seymour v. Western Railroad Co.,* 106 U.S. 320, 1 S.Ct. 123, 27 L.Ed. 103 (1882). In that case, the Supreme Court held that four copartners doing business under a common company name and style could maintain a contract action in their individual names

---

**4.** References to "Tr." are to pages of the Transcript of the January 25, 2001 hearing, submitted as part of the Record on Appeal.

even though they were not separately named as parties to the contract. Based on this holding, Judge Kaplan concluded as follows:

> [*Seymour*] would be controlling if Maple were attempting to collect money from Ohio Farmers instead of vice versa because Ohio Farmers would not be able to claim that it does not know Maple. If all the Bagel Bros. companies sued Ohio Farmers, Ohio Farmers would have to pay. And the result should be the same in this case. The High Court having ruled that you can be held liable to one whose existence was unknown to you, because you agreed to be held liable by whomever associated with your privy on that job, it follows that one may hold liable everyone who associated with your privy on that job if (1) that was your privy's choice, and (2) your privy had the authority to find [sic] them all. They may seek contribution among themselves. The Gershbergs had the authority, and by their understandable pride in their trade "style," it was their choice to bind their various companies, inadvertent as it might have been.

*In re Bagel Brothers*, 264 B.R. at 267. Thus, according to Judge Kaplan, in directing Ohio Farmers to bill "Bagel Brothers" in Buffalo, the Gershbergs "either intentionally or unintentionally" bound all of the companies they controlled to all debts incurred in conducting their bagel business, whether in Ohio or Buffalo. *Id.* Accordingly, Judge Kaplan overruled Maple's objection and allowed Ohio Farmers' claim.

On May 18, 2001, Judge Kaplan issued an order amending his April 3, 2001 decision to read as follows:

> The evidence provided in the form of Robert Gershberg's testimony suggests that Ohio Farmers invoices were paid with checks drawn on accounts in the name of the respective Ohio corporations, though no documentary evidence was offered in that regard.
>
> . . . .
>
> Although it is clear that Ohio Farmers knew of the Ohio corporations and delivered to them, and might have seen payment of their invoices by checks drawn on accounts in the names of the various Ohio corporations (as was suggested by the testimony of Robert Gershberg), there is not a scintilla of evidence to suggest that Ohio Farmers was told or otherwise led to believe, until *after* Maple's Chapter 11 filing, that it was only the Ohio corporations that were to be liable.
>
> . . . .
>
> In sum, this case is about a state of confusion caused by Maple's principals, and they may not be heard to benefit from their own wrong. Ordinarily, that would not be visited upon Maple (or its other creditors), but by some time in 1995, it owned nearly all the Buffalo stores. Even in 1993, Maple was one instrumentality by which the Gershbergs could enjoy the reputation upon which it obtained credit from Ohio Farmers. But more importantly, it is the entity into which virtually all value of the brothers' bagel business eventually flowed.

(5/18/01 Order, Bankruptcy Court Docket Item 158); *see In re Bagel Brothers*, 264 B.R. at 262, 265, 266.

Maple appeals Judge Kaplan's rulings, and the parties have briefed and argued their respective positions. For the following reasons, I find that Judge Kaplan erred in holding Maple liable for the obligations of the Ohio Bagel Brothers entities without considering the well-established legal standards for disregarding the corporate form, and without considering whether Ohio Farmers' claim is barred by the

Statute of Frauds. Accordingly, the case is remanded to the bankruptcy court for further proceedings.

### DISCUSSION

#### I. Standard of Review

■ Rule 8013 of the Federal Rules of Bankruptcy Procedure provides the standard governing district court review of a bankruptcy judge's order. This rule provides:

On an appeal the district or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

Fed.R.Bankr.P. 8013; *see In re Duratech Industries, Inc.*, 241 B.R. 283, 286 (E.D.N.Y.1999). Under this standard, the district court "is not authorized to engage in independent fact finding [and] reviews the bankruptcy court's findings ... only for clear error." *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 210 n. 19 (3d Cir.1995). The findings of fact can only be set aside by the district court when, after reviewing the evidence, the court "is left with the definite and firm conviction that a mistake has been committed." *In re Vogel Van & Storage, Inc.*, 59 F.3d 9, 12 (2d Cir.1995) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

■ In contrast to questions of fact governed by the clearly erroneous standard, a *de novo* standard of review applies to questions of law, as well as to mixed questions of fact and law. *In re United States Lines, Inc.*, 197 F.3d 631, 640–41 (2d Cir.1999). Thus, "[w]hile [the reviewing] court is obliged to accept the bankruptcy court's undisturbed findings of fact unless they are clearly erroneous, it is not required to accept its conclusions as to the legal effect of those findings." *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir.1987) (citing cases).

■ In this case, the historical facts underlying the bankruptcy court's findings are essentially undisputed. Additionally, Judge Kaplan did not specifically delineate his findings as involving either factual or legal questions, or mixed questions of fact and law. He did, however, note a distinction between his finding that Ohio Farmers was justified in believing it had contracted with the Bagel Brothers corporate entity, and the legal effect of this finding—*i.e.*, Maple's liability for the debts of the Ohio corporations. Accordingly, under these circumstances, this court must consider the arguments presented to the Bankruptcy Judge *de novo* and "reach its own legal conclusions 'without deferential regard to those made by the bankruptcy court.'" *In re Blatstein*, 226 B.R. 140, 149 (E.D.Pa.1998) (quoting *In re Graves*, 156 B.R. 949, 954 (E.D.Pa.1993), *aff'd*, 33 F.3d 242 (3d Cir.1994)).

#### II. Appellant's Argument

Maple's argument on appeal has two essential components. First, Maple contends that the bankruptcy court erred in finding it liable for the Ohio corporations' debts without analyzing the case under the legal standards for disregarding corporate form. Second, Maple contends that Ohio Farmers' claims are barred by the Statute of Frauds, set forth at New York General Obligations Law § 5–701, which requires that an agreement to answer for the debt of another be in writing. Each of these arguments is addressed in turn.

## A. Disregarding Maple's Separate Corporate Existence

As Maple points out, New York courts have long held that a corporation may exist independently of its owners as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners. *See Morris v. New York State Department of Taxation and Finance*, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993) (citing cases); *see also Securities Investor Protection Corporation v. Stratton Oakmont, Inc.*, 234 B.R. 293, 321–22 (Bankr.S.D.N.Y.1999); *Goya Foods, Inc. v. Unanue–Casal*, 982 F.Supp. 103, 107–08 (D.P.R.1997) (applying New York law). The courts have also recognized the need to disregard the corporate existence, or "pierce the corporate veil," in certain limited circumstances in order to hold owners or other entities liable for some underlying corporate obligation. *Morris*, 82 N.Y.2d at 140–41, 603 N.Y.S.2d 807, 623 N.E.2d 1157; *see also Thomson–CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 776–78 (2d Cir.1995) (discussing five recognized theories for binding nonsignatories to arbitration agreements).

Maple contends that, by ignoring these fundamental principles of limited corporate liability and veil piercing, the bankruptcy court created and applied a new theory of corporate liability never before recognized by the courts. Maple cites *Walkovszky v. Carlton*, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966), in which the New York Court of Appeals stated the general rule that, "[b]roadly speaking, the courts will disregard the corporate form ... whenever necessary 'to prevent fraud or to achieve equity.'" *Id.* at 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (quoting *International Aircraft Trading Co. v. Manufacturers Trust Co.*, 297 N.Y. 285, 292, 79 N.E.2d 249 (1948)). However, courts are generally reluctant to disregard the separate existence of related corporations by piercing the corporate veil, and have consistently given substantial weight to the "presumption of separateness." *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 732–33 (S.D.N.Y.1986) (citing cases). Thus, the party seeking to pierce the veil between a parent corporation and a subsidiary must show (1) that the subsidiary is a "mere instrumentality" of the parent, and (2) that the subsidiary is being used by the parent in order to commit or conceal fraud or other wrongdoing. *Id.* at 733.

In addition to the "traditional" application of the veil-piercing doctrine to assess individual liability for corporate debts, New York also recognizes the doctrine of "reverse" veil-piercing to hold a corporate entity accountable for the actions of its shareholders. *See American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) (citing *State v. Easton*, 169 Misc.2d 282, 647 N.Y.S.2d 904, 908–09 (Sup.Ct.1995)); *see also In re Vytautas Vebeliunas*, 2002 WL 115656, at *6 (S.D.N.Y. January 28, 2002); *Goya Foods*, 982 F.Supp. at 108 (reverse piercing is available when the court disregards corporate form to reach the assets of a corporation for the debts of its owners). "Courts that pierce the corporate veil in reverse are guided by the rules that govern straight veil piercing." *Securities Investor Protection*, 234 B.R. at 321.

A brief discussion of some of the pertinent veil-piercing cases illustrates the persuasiveness of Maple's arguments on appeal. For example, in *Walkovszky*, the plaintiff was seriously injured when he was struck by a New York City taxicab. He sued the driver, as well as the corporation that owned the cab and the individual

named Carlton who owned the corporation. Carlton actually owned ten separate corporations, each having only two cabs registered in its name. The plaintiff alleged that these corporations operated as a single entity with regard to financing, employees, repairs, garaging, etc., and named them all as defendants. The Court of Appeals rejected the plaintiff's claim against Carlton, finding insufficient allegations of "perversion of the privilege to do business in a corporate form" to justify imposing personal liability on the individual owner or stockholders. *Id.*, 18 N.Y.2d at 420, 276 N.Y.S.2d 585, 223 N.E.2d 6 (quoting *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 95, 155 N.E. 58 (1926)).

In reaching its holding with respect to the plaintiff's claim against Carlton, the court stated as follows:

> In the case before us, the plaintiff has explicitly alleged that none of the corporations "had a separate existence of their own" and, as indicated above, all are named as defendants. However, it is one thing to assert that a corporation is a fragment of a larger corporate combine which actually conducts the business. It is quite another to claim that the corporation is a "dummy" for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends. Either circumstance would justify treating the corporation as an agent and piercing the corporate veil to reach the principal but a different result would follow in each case. In the first, only a larger *corporate* entity would be held financially responsible while, in the other, the stockholder would be personally liable. Either the stockholder is conducting the business in his individual capacity or he is not. If he is, he will be liable; if he is not, then, it does not matter—insofar as his personal liability is concerned—

> that the enterprise is actually being carried on by a larger "enterprise entity."

*Id.*, 18 N.Y.2d at 418–19, 276 N.Y.S.2d 585, 223 N.E.2d 6 (emphasis in original; citations omitted).

The *Kashfi* case, also cited by Maple, involved a claim brought by an individual Iranian oil trader for services rendered pursuant to a letter agreement he entered with the representative of the British subsidiary of an American commodities trading organization. The plaintiff sought to pierce the corporate veil between the subsidiary and the parent corporation in order to recover from both the subsidiary's representative and the parent (the subsidiary was not made a party to the action). The district court granted the parent corporation's motion for summary judgment, finding insufficient evidence to disregard the separate corporate existence of the two companies. Instead, the record established that the subsidiary was incorporated under separate law, had a separate board of directors, its own bank account, its own credit standing, maintained separate offices, was separately managed, and its business affairs were conducted independently. *Kashfi*, 628 F.Supp. at 734–35. As stated by the court, "[t]he picture that emerges from this set of facts is not one of domination and control, but rather one of a group of related companies, in different countries, working closely together." *Id.* at 734.

In *Coastal States Trading, Inc. v. Zenith Navigation S.A.*, 446 F.Supp. 330 (S.D.N.Y.1977), the plaintiff was consignee of a cargo of fuel oil which was lost at sea on a vessel owned by the defendant. The plaintiff sought to recover the value of the oil, and the defendant sought to compel the plaintiff and several related subsidiary corporations to arbitrate the dispute pursuant to an arbitration clause in the charter

agreement between the defendant and the subsidiaries' common parent. The record showed that the various corporations were closely related, interdependent "arms" or "divisions" of a large energy conglomerate, sharing common offices and business telephones, with "substantial overlap of both the highest corporate officers and directors" and "mechanics of . . . financial accounting . . . resembl[ing] that between divisions of a single large corporation." *Id.* at 336. In dealing with the defendant's attempt to pierce the corporate veil in order to compel arbitration, the court stated as follows:

> [W]hen a parent corporation so dominates and controls the affairs of its corporate subsidiary that the subsidiary cannot be said to have any independent existence or will of its own, then the courts may pierce the corporate veil of the subsidiary and bind the parent to the contractual obligations incurred by the subsidiary effectively at the parent's behest. Or, conversely, a subsidiary may, under some circumstances, be held bound to obligations undertaken by its parent. Such a disregard of the separate corporate trappings of the subsidiary may be appropriate if it is found that the subsidiary was expressly functioning as agent for the parent, . . . or, in the absence of such an agency relationship, if the subsidiary is merely an "instrumentality" of the parent.

*Id.* at 336–37 (citations omitted). The court ultimately rejected the defendant's position, finding the evidence insufficient to show that the dealings between the related companies was "conducted on anything but an arm's length basis, or that the employees . . . failed to observe the formalities incident to doing business in the corporate form." *Id.* at 337.

■ Similarly, in *TNS Holdings, Inc. v. MKI Securities Corp.*, 92 N.Y.2d 335, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998), the New York Court of Appeals considered whether a corporation claimed to be the "alter ego" of a party to an agreement containing an arbitration clause could itself be compelled to arbitrate a dispute arising from an alleged breach of the agreement. The court concluded that the nonsignatory corporation could not be compelled to arbitrate absent a showing of abuse of the corporate form. As stated by the court:

> Akin to piercing the corporate veil to "prevent fraud or to achieve equity," [the "alter ego"] exception applies as well in determining whether a nonsignatory to an arbitration agreement should be bound by it. Those seeking to pierce a corporate veil of course bear a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences. Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance.

*Id.* at 339, 680 N.Y.S.2d 891, 703 N.E.2d 749 (citations omitted). Finding nothing in the record to suggest that the nonsignatory "misused the corporate form for its personal ends so as to commit a fraud or wrongdoing or avoid any of its obligations . . .," *id.* at 340, 680 N.Y.S.2d 891, 703 N.E.2d 749, the court refused to impute an agreement to arbitrate.

*Quinn, Brein & Brock, Inc. v. Pharmed Laboratories, Inc.*, 1989 WL 57420 (E.D.N.Y. May 23, 1989), is also instructive. In that case, the plaintiff entered an agreement with Amy Wasserman, the one-third owner of Pharmed Laboratories, to provide public relations services to Pharmed in connection with the marketing of Cabbage Patch Kids chewable children's vitamins. The other (two-thirds) owner of

Pharmed was the Tishcon Corporation, which was in the business of making and distributing vitamin and mineral supplements. When the Cabbage Patch Kids vitamin enterprise failed, plaintiff sued Pharmed and Tishcon, seeking $85,677.34 for services rendered. The district court granted Tishcon's motion for summary judgment, finding no reason to pierce the corporate veil in order to impose liability on Tishcon for Pharmed's debts. According to the court, Tishcon had nothing to do with Wasserman's agreement with the plaintiff, and gave no guarantee that it would be responsible for plaintiff's bills to Pharmed. The court also found no evidence that Tishcon inflicted a fraud or wrong on the plaintiff, or that Tishcon received any preferential treatment from Pharmed to the plaintiff's detriment. As stated by the court, "[b]ecause separate incorporation serves a legitimate public end, New York has been reluctant to disregard corporate forms" to impose liability on a corporation for the debts of a subsidiary or related corporation. *Quinn, Brein & Brock*, 1989 WL 57420, at *3. "Indeed, even the fact that corporations have identical controlling stockholders, officers, and directors does not, by itself, warrant disregard of the separate corporate entities." *Id.* (citing *Ioviero v. Ciga Hotels, Inc.*, 101 A.D.2d 852, 475 N.Y.S.2d 880, 881 (2nd Dep't 1984)).

■ The *Ciga Hotels* case is itself instructive. In that case, the plaintiff was injured when she slipped and fell while exiting the dining room at the Hotel Excelsior in Venice, Italy, during her stay there as a guest. The plaintiff sued the Italian corporation which owned the hotel chain, as well as the New York corporation engaged as the chain's North American sales representative under the same corporate trade name and using the same corporate letterhead. The Appellate Division of the New York Supreme Court found that the hotel owner and the sales representative were separate and distinct corporate entities, despite the fact that no discovery had been had with respect to whether the New York and Italian corporations shared the same shareholders, board of directors, and officers. As stated in *Ciga Hotels:*

> Courts will only pierce the corporat[e] veil and hold two corporations to constitute a single legal unit, where one is so related to, or organized, or controlled by, the other as to be its instrumentality or alter ego. The fact plaintiffs may discover that the two corporations have identical controlling shareholders, officers and directors does not, by itself, warrant disregarding the separate corporate entities.

*Ciga Hotels,* 101 A.D.2d at 853, 475 N.Y.S.2d at 881 (citations omitted); *see also Berkey,* 244 N.Y. at 88–89, 155 N.E. 58 (plaintiff injured through negligence of streetcar motorman could not reach parent corporation of streetcar company, even though parent owned substantially all stock of subsidiary, reported subsidiary's income as its own, shared directors and officers, made loans to subsidiary, and streetcars were owned by and marked with parent's name).

As this discussion demonstrates, the factual situations and legal analyses presented in these cases are decidedly closer to the mark than the *Seymour* case, which was the sole case law authority relied on by the bankruptcy court to support its findings. In *Seymour,* the Supreme Court allowed several persons who described themselves as "copartners trading in the name and style of S. Seymour & Company," 106 U.S. 320, 1 S.Ct. 123, to maintain an action in their individual names against the other contracting party even though none of the individuals were named in the contract. The Court held as follows:

In an action upon a covenant made with two or more persons, all the covenantees must join, although only one of them seals the agreement. It is not necessary that all of them should be named in the contract; it is sufficient that they are so described therein that they can be identified. And upon a covenant with a partnership by its partnership name only, all who are partners at the time of its execution may sue.

*Id.* at 321, 1 S.Ct. 123.

Relying on this limited holding, the bankruptcy court reasoned that, since *Seymour* would be controlling if Maple were attempting to collect money from Ohio Farmers (because Ohio Farmers would not be able to claim it did not know about Maple), the result should be the same here, where Ohio Farmers sought to collect money from Maple. *See In re Bagel Brothers*, 264 B.R. at 266–67. *Seymour* was not cited by either party in the letter briefs submitted to the bankruptcy court (*see* Exh. K) or on appeal.

In this court's view, *Seymour* provides little, if any, authority for holding that the common owners of several separate corporations using the same trade name could "either intentionally or unintentionally" bind all of those corporations to an agreement involving only a few, where the corporate form had been meticulously adhered to and there was no evidence of fraud or other wrongdoing. First of all, *Seymour* was decided in 1882, long before the rules for disregarding corporate separateness in New York emerged from *Walkovszky* and its progeny. Secondly, *Seymour* involved contract rights asserted by individual partners in a partnership which, of course, is a discrete form of business entity having its own rules for attaching individual liability separate and distinct from the rules for imposing liability on one corporation for the debts of another.

In addition, even if the bankruptcy court was correct in relying on *Seymour* as persuasive authority, application of its principles would ostensibly result in holding the Gershbergs liable as the individual owners of the Ohio Bagel Brothers stores, not Maple. As appellant points out, Maple never had any direct dealings with Ohio Farmers, and the corporate name "Bagel Brothers Maple" does not appear in any of the documents submitted by Ohio Farmers as evidence of its contractual relationship with the Bagel Brothers entity. Furthermore, as Judge Kaplan recognized, "Ohio Farmers has not sued the Gershbergs, presumably because there has never been any doubt that they acted only as agents for some corporate entity or entities. There is no claim ... that they personally deceived or defrauded Ohio Farmers." *In re Bagel Brothers*, 264 B.R. at 263.

Thus, should the bankruptcy court's holding stand, this court would effectively recognize a legal obligation on the part of Maple—a company owned by the Gershbergs—where there is no obligation on the part of the Gershbergs themselves. As indicated by the discussion of the holdings in the cases above, such a result has no basis in law. Indeed, at the outset of his opinion, Judge Kaplan acknowledged the scant legal support for his conclusions with respect to Maple's liability: "To be candid, [*Seymour*] is the sole case authority (with some support by authorities cited by the creditor) for what appears to be the correct result. (As noted, the question is a novel one.)" *Id.*, 264 B.R. at 261; *see also id.* at 266 ("This writer knows not whether the question is novel because there are no reported cases directly in point, or whether there are no reported cases in point because the facts are unique.").

Maple also argues that the bankruptcy court erred by applying an "agency" theory to find Maple liable for the Ohio enti-

ties' obligations based on the Gershbergs' use of "Bagel Brothers" as a common trade name. As Maple points out, the test for determining whether a corporation is acting as an agent for a related corporation is the same as the test for determining whether to pierce the corporate veil. *See Kashfi,* 628 F.Supp. at 735 (citing *Fidenas AG v. Honeywell Inc.,* 501 F.Supp. 1029, 1037 (S.D.N.Y.1980)). In addition, New York courts have specifically rejected use of a common trade name as a basis for disregarding the corporate form. *See, e.g., A/S Domino Mobler v. Braverman,* 669 F.Supp. 592 (S.D.N.Y.1987) (finding no basis for disregarding corporate separateness of several furniture retail outlets owned by the same individual and doing business under the trade name "Great North Woods").

■■■ In response to these arguments, Ohio Farmers contends that their representatives were entitled to rely upon the Gershbergs' representations that Ohio Farmers would be paid by a singular enterprise known as "Bagel Brothers," and therefore had no further duty to investigate whether such an entity existed, citing *Tarolli Lumber Co., Inc. v. Andreassi,* 59 A.D.2d 1011, 399 N.Y.S.2d 739 (4th Dep't 1977). However, *Tarolli* is not persuasive here. The primary holding in *Tarolli* is that "[o]ne who assumes to act as agent for a principal which has no legal status or existence renders himself liable on the contract so made." *Id.,* 59 A.D.2d at 1012, 399 N.Y.S.2d at 740 (citing 2 N.Y.Jur., Agency § 281). Thus,where an agent for an undisclosed or nonexistent principal enters an agreement, the other contracting party has no duty to investigate because the agent himself is held liable. *Id.* In this case, while non-disclosure might conceivably provide a basis for imposing individual liability on the Gershbergs, such a theory provides no basis for imposing corporate liability on Maple as a non-disclosing agent, in the absence of an accompanying "piercing the corporate veil" analysis.

■■■ In short, New York courts have long held that corporations exist independently of their owners as separate legal entities, that individual owners or parent corporations are not ordinarily held liable for the debts of their properly maintained corporations or subsidiaries, and that incorporation for the express purpose of limiting liability is perfectly legal. The bankruptcy court's decision essentially disregarded these fundamental principles, relying instead on a theory of corporate liability never recognized by New York courts and supported only by a 120–year–old Supreme Court case dealing with the contractual rights of individual partners in a partnership. Accordingly, I find that the bankruptcy court erred in holding Maple liable for the obligations of the Ohio Bagel Brothers entities without considering the well-established legal standards for disregarding the corporate form.

### B. Statute of Frauds

■■■ Maple also argues that the bankruptcy court erred by failing to consider whether Ohio Farmers' claim was barred by the Statute of Frauds, which is set forth at New York General Obligations Law § 5–701 as follows:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> . . .
>
> [i]s a special promise to answer for the debt, default or miscarriage of another person . . . .

N.Y.Gen.Oblig.Law § 5–701(a)(2). According to Maple, because the debt sought

to be recovered by Ohio Farmers was incurred by the separate Ohio "Bagel Brothers" entities, Ohio Farmers cannot recover from Maple in the absence of a written agreement to answer for the Ohio companies' debts.

Indeed, as it did with Maple's corporate separateness argument, the bankruptcy court summarily rejected Maple's Statute of Frauds argument without any specific discussion of the issue. *See In re Bagel Brothers*, 264 B.R. at 265 ("Maple's first five arguments all ignore the Court's finding of fact, and are, thus, rejected."). Presumably, this is because the court found that the obligation imposed on Maple was not the debt of another, but was Maple's own obligation, based on the Gershbergs' promise to Ohio Farmers that payment would be made by the Bagel Brothers companies. However, it follows from the discussion above that, if the bankruptcy court's consideration of the legal standards for determining whether to pierce the corporate veil should reveal no basis for disregarding Maple's corporate separateness, then the Gershbergs' representations would be cast in a different light.

As stated by the New York Court of Appeals in *Martin Roofing, Inc. v. Goldstein*, 60 N.Y.2d 262, 469 N.Y.S.2d 595, 457 N.E.2d 700 (1983):

> The purpose of the [Statute of Frauds] is evidentiary, to avoid perjury, and incidentally to serve as a cautionary measure to avoid ill-considered actions. In most oral contracts, a writing is not required because the promisor has received something and the circumstances show probable liability. When a party promises to answer for the debt of another, however, the benefit to the promisor is not apparent and so the promise, if it is to be enforceable under the statute, must either be evidenced by writing or plaintiff must prove it is supported by

> a new consideration moving to the promisor and beneficial to him and that the promisor has become in the intention of the parties a principal debtor primarily liable.

*Id.* at 265, 469 N.Y.S.2d 595, 457 N.E.2d 700. In this case, the record presented to the court contains no clear indication that Maple (as a separate corporate entity) had any direct dealings with Ohio Farmers, made any promises to pay, or received any consideration creating an independent obligation or inference that Maple was intended to become primarily liable for the debts of the Ohio corporations. Based on this record, and in light of the discussion above with respect to the requirements for disregarding the corporate form, I find that the bankruptcy court should have at least indicated whether it considered Maple's Statute of Frauds argument.

Accordingly, upon *de novo* review of the bankruptcy court's conclusions in light of the arguments and authorities presented by the parties, I find that the court erred when it allowed Ohio Farmers' claim against Bagel Brothers Maple, Inc., without considering the well-recognized rules for piercing the corporate veil, and when it summarily rejected Maple's argument that the claim was barred by the Statute of Frauds. Because of the extensive records and proceedings already before the bankruptcy court, as well as the factfinding undertaken since the outset of the Chapter 11 filings in this case, the appropriate course for this court to take is to reverse the Bankruptcy Judge's order and remand the matter to the bankruptcy court, in accordance with Rule 8013 of the Federal Rules of Bankruptcy Procedure, with instructions to reconsider Ohio Farmers' claim against Maple under the legal standards discussed above for determining whether to disregard the corporate form

and whether to apply the Statute of Frauds.

### CONCLUSION

For the foregoing reasons, the case is reversed and remanded to the bankruptcy court for further proceedings in accordance with this opinion.

So ordered.