**MERRILL LYNCH INTERFUNDING, INC., Plaintiff–Appellant,**

v.

**Patrick ARGENTI and Jean Argenti, Defendants–Counter–Claimants– Appellees.**

**Docket No. 97–9151.**

United States Court of Appeals, Second Circuit.

Argued April 2, 1998.

Decided Aug. 28, 1998.

Sanford S. Asher, New York, NY (Gregory E. Galterio, Jaffe and Asher, New York, NY, of counsel), for Plaintiff–Appellant.

Peter S. Herman, New York, NY (Sonya M. Kaloyanides, McLaughlin & Stern, LLP, New York, NY, of counsel), for Defendants–Appellees.

Before: McLAUGHLIN and PARKER, Circuit Judges, and EGINTON,* District Judge.

PARKER, Circuit Judge:

Plaintiff–Appellant Merrill Lynch Interfunding, Inc. ("MLIF") appeals from a judgment entered July 17, 1997 in the United States District Court for the Southern District of New York (Thomas P. Griesa, *Chief Judge* ) following a six-week bifurcated trial before the district court and a jury. MLIF also appeals from an Amended Opinion of the district court granting in part and denying in part MLIF's post-trial motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), for a new trial pursuant to Fed. R.Civ.P. 59(a) or to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e).

MLIF commenced this action against Defendants–Appellees Patrick and Jean Argenti (the "Argentis") seeking payment on various promissory notes the Argentis had executed in favor of MLIF in an aggregate principal amount of $6.925 million (the "Argenti Notes"), and the Argentis subsequently interposed counterclaims against MLIF. These

---

* The Honorable Warren W. Eginton, Senior Judge of the United States District Court for the District of Connecticut, sitting by designation.

counterclaims alleged breach by MLIF of an oral agreement, as well as breach of fiduciary duty by MLIF. At the close of the liability phase of the trial, the district court found the Argenti Notes to be valid and enforceable as a matter of law, and accordingly sent only the Argentis' counterclaims to the jury. The jury returned verdicts in favor of the Argentis on both counterclaims, and subsequently awarded the Argentis damages on those counterclaims. This damage award served to set off a large amount of principal and accrued interest on the Argenti Notes, resulting in a net judgment of approximately $735,-000 in favor of MLIF.

## I. BACKGROUND

MLIF, a Delaware corporation and subsidiary of the large financial institution Merrill Lynch & Co., Inc., is engaged in the business of conducting middle-market leveraged buy-outs and related transactions. As alluded to above, MLIF commenced this suit against the Argentis in April 1992, seeking payment of approximately $11 million in unpaid principal and accrued interest, together with statutory interest on interest and loan collection expenses, on the Argenti Notes. The Argenti Notes represented the personal participation of the Argentis in a series of loans made by MLIF to Argenti, Inc. (the "Company"), a now liquidated corporation, which was owned, founded and controlled by Patrick Argenti, and was engaged in the design and sale of ladies silk garments.

In November 1988, MLIF loaned the Company approximately $15 million in return for a warrant to purchase 40% of the issued and outstanding shares of common stock of the Company, at a price of $1 per share (the "1988 Buyout"). This loan consisted of a subordinated term loan of $11.5 million (the "Junior Loan") to the Company, and a $3.5 million line of credit in favor of the Company. These loans were secured by a security interest granted MLIF in substantially all the assets of the Company, pursuant to a Loan and Security Agreement (the "Corporate Security Agreement").

As part of the 1988 Buyout, MLIF and Patrick Argenti entered into a Stockholders Agreement, dated as of November 10, 1988 (the "Stockholders Agreement"), which, among other things, afforded MLIF the right to appoint two of the Company's five directors. Patrick Argenti and the Company also entered into an Employment Agreement (the "Employment Agreement") incident to the 1988 Buyout. The Corporate Security Agreement, the Employment Agreement and the Stockholders Agreement each contained a provision which sought to prevent oral modification or termination of the agreement.

In July 1990, MLIF and the Company restructured the Junior Loan into a loan for $16.541 million, which sum represented the unpaid principal and interest then outstanding on the Junior Loan. In connection with this restructuring, MLIF and the Company entered into an Amended and Restated Loan and Security Agreement (the "Amended Corporate Security Agreement"), which again contained a no oral modification or termination clause. To evidence this debt, the Company executed an Amended and Restated Term Note with a principal amount of $16.541 million (the "Junior Note"). The Junior Note stated that it was "subject to all of the agreements, terms and conditions" of the Amended Corporate Security Agreement.

MLIF loaned the Company and the Argentis additional monies between 1989 and 1991, with the parties terming these loans "Advances." In November 1989, MLIF advanced $800,000 to the Company, and Patrick Argenti advanced $1.2 million to the Company. MLIF subsequently purchased this $1.2 million advance from Patrick Argenti in July 1990, leaving MLIF as the obligee on the entire $2 million of advances made in 1989. After this purchase, the Company made a promissory note in favor of MLIF in the amount of $2.146 million, representing the principal and accrued interest on the November 1989 advances. Also in July 1990, MLIF advanced an additional $5 million to the Company. This loan was consolidated with the November 1989 advances, into a loan with principal of $7.146 million (the "Senior Loan"). The Company executed a promissory note evidencing this debt, which again was subject to the terms and conditions of the Amended Corporate Security Agreement.

As a condition of the Senior Loan, MLIF required that the Argentis purchase a 53.01% interest therein, or $3.78 million. The Argentis and MLIF entered into a Participation Agreement (the "Participation Agreement"), which memorialized this understanding. In effect, the Participation Agreement amounted to a personal guarantee by the Argentis of the payment of 53.01% of the Senior Loan. The Participation Agreement again contained a no oral modification clause. The Argentis' participation in the Senior Loan was secured by a security interest granted MLIF in certain real property and artwork owned by the Argentis, pursuant to a Security Agreement (the "Personal Security Agreement") and a Mortgage Deed (the "Mortgage Deed"). The Personal Security Agreement also contained a no oral modification clause. The Argentis executed a promissory note in favor of MLIF in the amount of $3.7 million to evidence this debt, and this constituted the first of the Argenti Notes. The original Argenti Note stated that it was "subject to all of the agreements, terms and conditions" contained in the Personal Security Agreement.

Subsequently, MLIF made four additional advances to the Company pursuant to this same structure: with the Argentis participating in the advances, and with written amendments to the operative documents.[1] These advances were made as follows:

| Date | Company Advance | Argenti Participation | Note Name |
|---|---|---|---|
| 11/29/90 | $1.5 million | $750,000 | 1st Additional Argenti Note |
| 3/11/91 | $1.5 million | $750,000 | 2d Additional Argenti Note |
| 5/10/91 | $3.0 million | $1.5 million | 3d Additional Argenti Note |
| 9/18/91 | $500,000 | $250,000 | 4th Additional Argenti Note |

The amendments to the operative documents at each advance included amendments to both the Corporate and the Personal Security Agreements, as well as to the Participation Agreement. Further, with regard to the 4th Additional Argenti Note (which also deferred certain payment obligations under the previous notes), all of the previous Argenti Notes were amended in writing to reflect the same. In the aggregate, as of September 30, 1991, the Argentis personally had

executed Notes with a principal amount of $6.925 million.

The need for these additional loans to the Company was caused largely by financial problems the Company began experiencing almost immediately following the 1988 Buyout. These problems were caused by, among other things, the effect of Chinese political crises on the price of silk, and the subsequent recession in the United States. In particular, the first advance (in November, 1989, in the amount of $2 million) was due to a request from CIT Group Factoring ("CIT"), the Company's factor, to make up losses suffered on account of the problems in China. CIT again asked for more money in January 1990, and this eventually led to the restructuring of the Junior Loan. This transaction, however, did not completely satisfy CIT, which Patrick Argenti understood at that time as having told the Company to find another factor.

To address the Company's ongoing problems with CIT, the Company, after discussion with MLIF, sent CIT a letter asking CIT to continue to provide interim financing to the Company until a new factor could be found. To this end, meetings with other factors were held, including one with Congress Talcott, Inc. ("Congress"). CIT, however, was not reacting favorably, and in November 1990, informed the Company that it would not extend additional credit to the Company until it posted additional cash collateral. MLIF provided the Company with cash for this purpose in the first additional advance, in which the Argentis participated. CIT made another demand for additional cash collateral in March 1991, which led to the second additional advance. Despite these increases in the Company's posted cash collateral, Congress turned the Company down on its first credit application.

MLIF advanced more funds to the Company in May 1991, again in response to a request from CIT that the Company post additional cash collateral. In September 1991, CIT wrote to the Company and formally stated that it would be best if the Company found a new factor, further stating the

---

1. The Argentis note the fact that these amendments were often dated on an "as of" basis; that is, the funds were disbursed and the transaction was papered later.

conditions on which it would continue to act as the Company's factor for an interim period of time. At about this same time, Congress informed the Company that it was ready to enter into an agreement with the Company, and requested a retainer so its attorneys could begin drafting the agreement. Despite this progress, CIT made yet another demand for additional cash collateral, which MLIF provided, as before, with the fourth additional advance. At this time the proposed transaction with Congress was progressing, and on September 20, 1991, Congress's counsel distributed a "to do" list to the parties regarding the matters that needed to be addressed prior to the closing of the new factoring agreement. The proposed transaction was scheduled to close on October 15, 1991, but when Congress expressed some hesitance, the closing was pushed back to October 31. In response to this hesitance, MLIF agreed to provide an additional $1 million advance to the Company, in exchange for an additional 9% of the stock in the Company and the appointment of a new neutral fifth director to the Company's board to act as chairman. MLIF prepared an internal report for credit approval on this additional advance (the "Credit Memo"). The Credit Memo detailed the history of the Company, MLIF''s involvement and the problems with CIT. The Credit Memo stated that it laid out "two possible transactions" that MLIF might engage in with the Company. The first of these transactions is described below. The second transaction is a mystery, as the page in the Credit Memo dealing with such is missing.[2] On the basis of the Credit Memo, MLIF''s credit committee approved an additional advance of $1.5 million to the Company.

The proposed transaction was structured as follows: (1) MLIF would extend the payment dates under the Argenti Notes and the notes representing the corporate loans; (2) MLIF would advance an additional $1 million to the Company (for which it would receive an additional 9% of the Company, and a neutral fifth director to act as chairman); (3) the Argentis would again participate in 50% of this advance; (4) MLIF and Congress would enter into an inter-creditor agreement; and (5) based on these transactions the Company and Congress would enter into a new factoring agreement. The proposed transaction was described in a Term Letter (the "Term Letter"), and a Note Deferral Letter (the "Note Deferral Letter"), which the parties, all represented by counsel, negotiated extensively during October 1991. The proposed transaction included substantial modifications to many of the agreements already in place, including all previously executed promissory notes.

Drafts of all the requisite agreements and amendments were negotiated and circulated. Congress's credit committee approved a line of credit in favor of the Company of $12.5 million to be secured by $7.5 million of cash collateral (to include the additional advance), and the parties selected a person to assume the role of chairman of the board of the Company. On October 29, 1991, a pre-closing meeting was held at the offices of Congress's counsel, at which the final details of the transaction were ironed out.[3] That afternoon, a paralegal working for MLIF''s counsel sent a by-hand package to Patrick Argenti containing execution copies of all of the relevant agreements. The package was accompanied by a cover letter that listed the enclosures, and directed the Argentis to execute those documents and return them to their counsel.[4] MLIF''s counsel subsequently

---

2. The Argentis contend that this second transaction was forcing the Company to file for bankruptcy, and the district court noted that "it is difficult to believe that its disappearance was the result of mere accident."

3. At this meeting, Patrick Argenti apparently engaged in a loud argument with Daniel Tully, Jr., one of the MLIF representatives at the meeting and the son of Merrill Lynch's CEO. The Argentis contend that this is basically the reason MLIF subsequently refused to close the transaction.

4. The full text of the cover letter was:

Dear Mr. Argenti:
  Enclosed please find execution copies of the following documents:
  1. Fifth Additional Promissory Note $500,-000 –1 copy
  2. Fourth Amendment to Security—4 copies
  3. Mortgage Deed—4 copies
  4. Term Sheet—4 copies
  5. Deferral letter—4 copies

called Patrick Argenti to confirm that he had received this package. Patrick Argenti took the documents home with him (as well as other relevant documents received in another package) that night where he and his wife signed them.

MLIF's counsel called Patrick Argenti the next morning to confirm that the Argentis had signed the documents and returned them to their counsel pending closing the next day. Sometime between the morning of October 30 and October 31, MLIF developed cold feet regarding the transaction. In the late morning or early afternoon of October 31, 1991, with the closing scheduled for later that afternoon, MLIF informed Patrick Argenti and Congress that it was not willing to close the transaction.

MLIF's refusal to close made the entire transaction with Congress fall apart. As such, CIT quickly froze the Company's assets and refused to extend any further lines of credit to the Company. In November 1991, MLIF met with the Company to discuss future options. At this meeting, MLIF requested that Patrick Argenti meet with other apparel companies controlled by MLIF, but no satisfactory arrangement could be reached. In February 1992, MLIF served a notice of default on the Company. The Company filed for Chapter 11 bankruptcy protection the next day, but was unable to find any further financing and was eventually liquidated, with all remaining assets turned over to MLIF as the Company's primary secured creditor.

In April 1992, MLIF served notices of default on the Argentis personally, and commenced this action. The Argentis subsequently interposed counterclaims against MLIF asserting breach of contract and breach of fiduciary duty. The breach of contract claim was based on an allegation that the parties had entered into an oral agreement which encompassed the terms of the proposed agreement as of the evening of October 29, and that MLIF had breached that agreement by, among other things, refusing to close the transaction and perform thereunder.

The district court held a six-week bifurcated jury trial. At the close of the liability phase, the district court found that the Argenti Notes were valid and enforceable as a matter of law, and thus took MLIF's claims away from the jury. The Argentis' counterclaims were, however, submitted to the jury. The first interrogatory to the jury asked simply: "Do you find that Merrill Lynch Interfunding, Inc. made a contract with Argenti, Inc. and Mr. and Mrs. Argenti and breached that contract?" The second interrogatory to the jury asked: "Do you find that Merrill Lynch Interfunding, Inc. committed a breach of fiduciary duty?" The jury answered both of these questions in the affirmative.

After the finding of liability, the issues on damages were presented to the jury. The interrogatories regarding damages were as follows:

Do you find that, as a result of [MLIF] not performing the contract, Mr. and Mrs. Argenti were damaged by being required to pay the notes relating to the [MLIF] advances to Argenti, Inc.?

The jury found that the Argentis had been so damaged in part, with MLIF causing 75% of the damage. The jury also found that Patrick Argenti had suffered lost compensation in the amount of $737,500 as a result of MLIF's breach. Based on these findings, and after considerable argument concerning the proper method to calculate damages, the district court determined that the aggregate principal and interest owed by the Argentis under the Argenti Notes would be discounted by 75%, and then the lost compensation would be subtracted therefrom, leaving a net judgment of $735,179 in favor of MLIF. The district court also determined that given the jury finding of breach of contract by MLIF the default rate of interest on the Argenti Notes did not apply, and rather, that the standard rate of interest on the notes applied.

Please have the documents signed and return all copies to Michael Shef, Esq. at Parker, Chapin, Flattau & Klimpl [the Argentis' counsel]. If you have any questions regarding the enclosures please do not hesitate to contact us.
/s/ Denise J. Riordan, Legal Asst.

MLIF filed a post-trial motion seeking relief from the jury verdicts. In this motion, MLIF sought, pursuant to Rule 50(b), judgment as a matter of law on the breach of contract claim and breach of fiduciary duty claims. Alternatively, MLIF sought a new trial on these claims pursuant to Rule 59(a). Further, with regard to damages, MLIF sought to have the lost compensation award set aside as a matter of law, or alternatively, a new trial on that issue. Finally, pursuant to Rule 59(e), MLIF sought to have the judgment altered or amended.

The district court granted MLIF judgment as a matter of law on the breach of fiduciary duty claim and denied the balance of the motion. With regard to the breach of contract claim, the district court held that although the alleged oral agreement was subject to the New York Statute of Frauds, N.Y. G.O.L. § 5–701, the package sent to Patrick Argenti on October 29, 1991, with the cover letter signed by the paralegal employed by MLIF's counsel, together with its enclosures, was a sufficient memorandum of the agreement to make the agreement enforceable. The district court also found that although under New York law oral modifications of written agreements which contain a no oral modification clause are unenforceable, in this case the no oral modifications clauses in the original agreements were overcome by partial performance of the alleged oral agreement, namely, the execution by the Argentis of the new note and the amendments to the Personal Security Agreement and the Mortgage Deed. This ruling was largely premised on wording contained in the Term Letter, specifically those portions that stated that as part of the proposed transaction the Argentis "will execute" the new note and the amendments.

## II. DISCUSSION

On appeal, MLIF claims that the district court erred in failing to grant it judgment as a matter of law on the Argentis' breach of contract claim. MLIF claims that the alleged oral agreement is unenforceable because it violates the New York Statute of Frauds, N.Y. G.O.L. § 5–701, as well as the New York statute which renders unenforceable oral modifications to written agreements which contain a clause barring such oral modifications. N.Y. G.O.L. § 15–301. MLIF also claims that the district court erred in allowing damages in the form of lost compensation to Patrick Argenti to be awarded. The Argentis do not cross-appeal either that portion of the district court's opinion granting judgment as a matter of law to MLIF on the breach of fiduciary duty counterclaim, or the district court's decision to find the Argenti Notes valid and enforceable as a matter of law. They do, however, assert that MLIF should be barred from asserting either § 5–701 or § 15–301 on the basis of equitable estoppel.

For the following reasons, we hold that the district court erred in failing to grant MLIF judgment as a matter of law on the breach of contract claim, and we therefore vacate the district court's judgment and remand this case to the district court for entry of a judgment in favor of MLIF for the full amount of unpaid principal and accrued interest on the Argenti Notes.

### A. Standard of Review

■ We review a district court's decision denying a motion for judgment as a matter of law *de novo,* applying the same standards as the district court to determine whether judgment as a matter of law was appropriate. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987).

■ Under Rule 50, judgment as matter of law is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for" a party. Fed. R.Civ.P. 50(a)(1). As we have previously stated, a court may properly grant judgment as a matter of law where "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.' " *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). In ruling on a motion for judgment as a matter of law, we "must view the evidence in a light most

favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Id.* at 16. We review the district court's decision in light of this well-established standard.

### B. *New York General Obligations Law § 15–301*

▇▇▇ New York General Obligations Law § 15–301(1) [5] provides that:

A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y. G.O.L. § 15–301. By its terms, however, this section applies only to "executory agreements," and accordingly, under the doctrine of partial performance, such an oral agreement may be enforced even in the absence of a writing if either party has partially performed under the terms of that oral agreement. *See Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343, 366 N.E.2d 1279, 1283, 397 N.Y.S.2d 922, 926 (1977).

The initial step in the analysis of the application of this statute is whether the oral agreement, which as found by the jury embodied the terms of the Term Letter and Note Deferral Letter as well as the subsidiary agreements thereto, and which was entered into by the parties on the evening of October 29, 1991,[6] included any modifications to written agreements containing clauses prohibiting oral modification. The district court found that the oral agreement did include such modifications, and, for the following reasons, we agree with the district court on this question.

First, ¶ 12(A) of the Term Letter states that the Stockholders Agreement, which contains a no oral modifications clause, "shall be amended." Further, ¶ 11 of the Term Letter states that the Corporate and Personal Security Agreements, both of which contain no oral modification clauses, "shall be amended." Other operative agreements containing no oral modification clauses, including the Participation Agreement and the Employment Agreement, were also to be amended pursuant to the terms of the Term Letter. Finally, the terms of the Note Deferral Letter, also a part of the oral agreement, deferred payment by the Argentis on certain payments on Argenti Notes, each of which stated that it was subject to all the agreements, terms and conditions of the Personal Security Agreements. As such, the Argenti Notes themselves contained, through incorporation, the no oral modification clause of the Personal Security Agreement. Accordingly, we find that the oral agreement "changed" the provisions of numerous written agreements which contained clauses seeking to prevent such modifications, and that § 15–301 therefore applies to the oral agreement.

▇▇▇ The next question under § 15–301 is whether there is any writing "signed by the party against whom enforcement of the change is sought or by his agent." N.Y. G.O.L. § 15–301. As noted by the district court, unlike the Statute of Frauds, § 15–301 requires more than a simple note or memorandum of agreement. *See DFI Communications, Inc. v. Greenberg*, 41 N.Y.2d 602, 606–07, 363 N.E.2d 312, 315, 394 N.Y.S.2d 586, 589–90 (1977). As the statute makes clear, any writing must be signed by the party to be charged or his agent. In this case, the only signed writing that could meet this test is the cover letter signed by a paralegal employed by MLIF's counsel, to-

---

**5.** Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d Cir.1998).

**6.** The district court found, and we agree, that this is almost certainly the time at which the jury considered the oral agreement to have arisen. The district court found that during the October

29 meeting the terms of the proposed agreement were still being negotiated, and that the parties had not yet entered into an agreement. The district court also found that the oral agreement was in effect at the time the October 29 package was sent, and was embodied in the terms of the documents enclosed in that package. Further, the Argentis trial counsel argued in summation that "there was a deal" at the end of that meeting.

gether with its enclosures. We hold that the cover letter, together with the enclosures, does not satisfy the statute. First, the cover letter was exactly that; it did not purport to bind MLIF in any way. The cover letter and enclosures was therefore insufficient even to meet the slightly lesser standard under the Statute of Frauds. *See Scheck v. Francis,* 26 N.Y.2d 466, 471–72, 260 N.E.2d 493, 495, 311 N.Y.S.2d 841, 844–45 (1970) (holding that a cover letter "written for the sole purpose of forwarding the documents to the parties for signature" from which it was "impossible to infer … an intent … to bring a contract into being" is insufficient to satisfy the Statute of Frauds).

■ This holding is also premised on standard principles of agency; namely that an agent must have authority, whether apparent, actual or implied, to bind his principal. Here, there is no question that the paralegal working for MLIF's counsel lacked any authority to bind MLIF to the terms of the agreement. Therefore the cover letter is insufficient to amount to a writing sufficient to meet the requirements of § 15–301. *See Longo v. Shore & Reich, Ltd.,* 25 F.3d 94, 96–97 (2d Cir.1994) (holding that a letter signed by an attorney, together with enclosed unsigned agreements, was not sufficient to overcome the Statute of Frauds).

■ Having determined that § 15–301 applies to the oral agreement, and that there is no writing signed by MLIF or its agent reflecting the changes, we turn to the question of whether any partial performance on the part of the Argentis overcame the strictures of the statute. Doing so, we find that, as a matter of law, there was no partial performance sufficient to overcome the strictures of the statute. For partial performance to overcome § 15–301, that partial performance must be "unequivocally referable" to the new contract. *Rose,* 42 N.Y.2d at 343–44, 366 N.E.2d at 1283, 397 N.Y.S.2d at 926. As interpreted by the New York Court of Appeals, this standard means that the action taken must be "unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Anostario v. Vicinanzo,* 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983) (cita-

tion and internal quotation omitted); *see also Jim Bouton Corp. v. Wm. Wrigley Jr. Co.,* 902 F.2d 1074, 1080 (2d Cir.1990) (applying § 15–301). Further, where the performance is "reasonably explained" by the possibility of other reasons for the conduct, the performance is equivocal. *Anostario,* 59 N.Y.2d at 664, 450 N.E.2d at 216, 463 N.Y.S.2d at 410. If "the performance undertaken by plaintiff is also explainable as preparatory steps taken with a view toward consummation of an agreement in the future," then that performance is not "unequivocally referable" to the new contract. *Id.* Finally, an action does not amount to partial performance sufficient to overcome the statute where that action confers no benefit on the party against whom enforcement is sought. *See Philips Credit Corp. v. Regent Health Group, Inc.,* 953 F.Supp. 482, 515 (S.D.N.Y.1997).

These standards are consistent with the principles underlying the doctrine of partial performance in contract law generally. The doctrine of partial performance is fundamentally premised on notions of estoppel and ratification. These notions are that a party seeking to avoid an agreement who accepts performance tendered by a party seeking to enforce that agreement either: (1) is estopped from denying the existence of the agreement because he accepted the benefit of the very agreement he is now seeking to avoid; or (2) that his conduct in accepting the tendered performance serves as an affirmative ratification of the existence of the agreement. *See R.G. Group, Inc. v. The Horn & Hardart Co.,* 751 F.2d 69, 75–76 (2d Cir.1984) ("[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect.").

Applying these principles to this case, we find that the district court erred in concluding that it was "clear beyond question" that "the execution of these instruments [namely, the new note and the amendments] constituted part performance of the new agreement." First, the signing of the new note and the amendments simply does not amount to partial performance "unequivocally referable" to the oral agreement. The Argentis' execution

of the documents is certainly at least reasonably explainable as preparatory conduct. The Argentis, one of whom would undisputedly not be attending the closing, were instructed to execute all enclosed documents, including the Term Letter and the Note Deferral Letter, and return the documents to their attorney, presumably to be held in escrow pending simultaneous closing. This procedure is a reasonably standard manner in which to close a multiparty transaction where at least one party will not be attending the closing. Thus, the actions of the Argentis in signing all of the enclosed documents and returning them to *their* lawyer prior to closing are reasonably explainable as preparatory conduct, and are therefore not "unequivocally referable" to the oral agreement.

While it is true that the Term Letter does state that the Argentis "will execute" the new note and the amendments, the fact that the Term Letter itself was one of the very documents which the Argentis were asked to execute, and which they did execute and deliver to their attorney, belies the district court's conclusion that the execution of the new note and amendments was unequivocally referable to the oral agreement. The district court's holding that the execution of the subsidiary agreements amounted to partial performance of the primary agreement completely ignores the fact that the primary agreements, including the Term Letter, which includes the very language the district court cites as showing partial performance, were also executed at the same time as the new note and amendments. This fact implies that the execution of the documents was merely preparatory, or at most, a memorialization of, rather than performance under, the oral agreement. We also note that the exact language of the Term Letter regarding the new note was "the Argentis will execute *and deliver* an additional promissory note," (emphasis added), again implying that the mere execution was not partial performance.

■ Second, the fundamental principles underlying the doctrine of partial performance are not implicated by the facts of this case because there was never any acceptance by MLIF of any partial performance tendered by the Argentis. The alleged partial performance, namely, the unilateral execution of the new note and amendments by the Argentis, was in no way directed toward or accepted by MLIF, and the execution of the new note alone conferred no benefit on MLIF, as promissory notes are not valid until delivered. *See State v. Barclays Bank, N.A.,* 76 N.Y.2d 533, 536–37, 563 N.E.2d 11, 12–13, 561 N.Y.S.2d 697, 698–99 (1990) (holding that "a check has no valid inception until delivery"). The execution of the documents would therefore only benefit MLIF at such time as those documents were delivered to MLIF, which they never were. *See Shearson Lehman CMO, Inc. v. TCF Banking & Savings, F.A.,* 710 F.Supp. 67, 71 (S.D.N.Y. 1989) ("As an initial matter, for there to be partial performance, [the party seeking enforcement of the agreement] must confer something of value on [the party seeking to avoid the agreement], which [the party seeking to avoid the agreement] accepts."). Accordingly, the unilateral execution of the new note and the amendments is legally insufficient to constitute partial performance so as to render the oral agreement enforceable because MLIF neither accepted nor benefitted from that action.

■ Finally, the other instances of partial performance alleged by the Argentis—the deferral of a payment by the Company on a note due in September 1991 and the search and selection of a new chairman of the board of the Company—occurred before the time the oral agreement was reached and thus can not be considered partial performance. *See O & Y (U.S.) Financial Co. v. Chase Family Ltd. Partnership,* No. 93 Civ. 1857, 1994 WL 250310 at *5 (S.D.N.Y. May 31, 1994). Likewise, given that the oral agreement arose only on the evening of October 29, 1991, there was therefore no detrimental reliance on the oral agreement by the Argentis sufficient to equitably estop MLIF from asserting § 15–301, despite any culpable conduct in which MLIF might have engaged. *See Cinema North Corp. v. Plaza at Latham Assocs.,* 867 F.2d 135, 141 (2d Cir.1989) (noting that detrimental reliance is an element of equitable estoppel under New York law); *see also Rose,* 42 N.Y.2d at 344, 366 N.E.2d at 1283, 397

N.Y.S.2d at 927 (holding that "conduct relied upon to establish estoppel must not be otherwise compatible" with an explanation other than the alleged new contractual modification). Therefore, the oral agreement is unenforceable under § 15–301 as an oral modification of existing written agreements which contain clauses prohibiting such oral modification, and MLIF is entitled to judgment as a matter of law on the Argentis' breach of contract counterclaim.

## III. CONCLUSION

Given that we hold that MLIF was entitled to judgment as a matter of law on the Argentis' breach of contract claim on the basis of N.Y. G.O.L. § 15–301, we need not reach the other arguments advanced by MLIF. Accordingly, the judgment of the district court is reversed, and this case is remanded to the district court for entry of judgment in favor of MLIF in the amount of the unpaid principal and accrued interest on the Argenti Notes, as determined based on the Argentis' default of their obligations under those notes.