**AL SAYEGH BROTHERS TRADING (LLC), et al., Plaintiffs,**

v.

**DORAL TRADING & EXPORT, INC., et al., Defendants.**

**No. 00 CV 3907(ILG).**

United States District Court, E.D. New York.

July 29, 2002.

Robert A. Calinoff, Calinoff & Katz, New York City, for Plaintiffs.

Joseph Zelmanovitz, Stahl & Zelmanovitz, New York City, for Defendants.

### MEMORANDUM & ORDER

GLASSER, District Judge.

This dispute arises out of a number of corporate transactions gone bad. Plaintiffs Al Sayegh Brothers Trading (LLC) ("Al Sayegh Brothers"), Abdul Jabbar Al Sayegh ("Al Sayegh"), and Ahmed Al Sayegh d/b/a Vision ("Vision") claim that they shipped certain electronic goods to defendants Doral Trading & Export, Inc. ("Doral"), Leiser Schwimmer d/b/a L & S Electronics ("Schwimmer"), and Regal Electronics Inc. ("Regal"), but that defendants did not pay for approximately $1 million worth of those goods. Defendants argue that plaintiffs agreed to forego the $1 million, in anticipation of continued beneficial dealings between the parties which would make up for the plaintiffs' loss.

Plaintiffs now move for summary judgment, arguing that defendants cannot prove that plaintiffs agreed to forego their claim to the $1 million. Two of the defendants—Schwimmer and Regal—cross-move for summary judgment, alleging that the outstanding amount owed to plaintiffs, if any, relates to goods shipped only to Doral, and therefore they cannot be held liable for the $1 million balance. For the reasons set forth below, plaintiffs' motion is denied, and Schwimmer and Regal's cross-motion is granted.

## BACKGROUND

Most of the pertinent background facts are not in dispute. Plaintiffs are electronics distributors based in Dubai, United Arab Emirates. (*See* Compl. ¶ 1; 3/19/02 Calinoff Aff. ¶ 8.) Doral is a New York corporation with its principal place of business in Brooklyn. (*See* 3/19/02 L. Schwimmer Decl. ¶ 3; Compl. ¶ 4.) Doral is wholly-owned by Schwimmer. (*See* 3/19/02 L. Schwimmer Decl. ¶ 3.) Regal also is a New York corporation with its principal place of business in Brooklyn. (*See* B. Schwimmer Decl. ¶ 3; Compl. ¶ 6.) Regal is wholly-owned by Bernard Schwimmer, Leiser Schwimmer's son. (*See* B. Schwimmer Decl. ¶ 4; 4/26/02 Calinoff Aff. ¶ 4.) Doral and Regal are engaged in the sale of consumer electronics. (*See* 4/26/02 L. Schwimmer Decl. ¶ 2; B. Schwimmer Decl. ¶ 4.)

Plaintiffs began supplying Doral with electronic goods in 1994. (*See* 4/26/02 L. Schwimmer Decl. ¶ 4.)[1] Doral then re-sold those goods throughout the Western Hemisphere, with an emphasis on Brazil. (*See id.*) Early on in their relationship, plaintiffs required Doral to pay for merchandise as it was received. (*See id.*) Eventually, however, plaintiffs permitted Doral to order goods on credit. (*See id.*)

Plaintiffs also supplied Regal with electronic goods. (*See* B. Schwimmer Decl. ¶ 4.) Defendants allege that plaintiffs supplied Regal with electronic goods only for a four-month period in 1996, while plaintiffs contend that Regal continued doing business with plaintiffs until at least 1998. (*See* 4/26/02 Calinoff Aff. ¶¶ 29–31.) Defendants also allege that plaintiffs never supplied Regal with goods on credit (*see* B. Schwimmer Decl. ¶ 5), an allegation to which plaintiffs have adduced no contradictory evidence.

Despite their apparent separateness, Doral and Regal appear to have operated under the same trade name, L. & S. Electronics, or a closely-related trade name, L.S. Electronics Co. (*See* 4/26/02 Calinoff Aff.Ex. Q.) Doral and Regal also operated out of the same building, and shared the same telephone numbers and warehouse space. (*See* B. Schwimmer Dep. at 6–12; L. Schwimmer Dep. at 13–25.) However, Doral and Regal always maintained separate offices, and Regal reimbursed Doral for "common expenses," such as use of the telephone lines and of warehouse employees. (*See* L. Schwimmer Dep. at 17–24.) Regal performed its own accounting functions and never borrowed or bought merchandise from Doral, and neither company sold merchandise on behalf of the other. (*See id.* at 24.) Nevertheless, according to plaintiffs, they considered Doral, Regal, and Schwimmer to all be one entity. (*See* Al Sayegh Dep. at 42–43 ("As far as we are concerned, we are only shipping to Doral, Regal, Leiser, whoever, as one entity, and one institution altogether, individually, collectively, joint and severally, that is what we understand. So they are responsible for any invoice.").)

At the outset of their dealings, the parties enjoyed an amicable business relationship. Over time, plaintiffs shipped at least $10 million worth of electronics equipment to Doral, which Doral successfully re-sold. As time wore on, however, the relationship began to sour. According to defendants, plaintiffs began shipping unordered merchandise to Doral, and charging Doral inflated prices for their goods. Plaintiffs also apparently missed certain shipping deadlines. Defendants' payments to plaintiffs began to lag. Complaints by defendants to plaintiffs to remedy the problems

---

1. The parties do not distinguish between the plaintiffs, and simply assert that all of them provided electronic goods to the defendants.

proved fruitless. Defendants allege that, by May of 1998, plaintiffs had shipped so much extra merchandise to them that many of the containers on which the goods arrived were lying, unopened, in port in South America. (*See* 4/26/02 Schwimmer Dec. ¶ 7.)

In light of these facts, a meeting was held at Doral's offices on May 18, 1998. (*See id.*) At that meeting, Schwimmer advised Sajid Mahmood ("Mahmood"), Managing Director of Vision and authorized representative of Al Sayegh Brothers, of "the situation of the glut in the market in Brazil, the place where almost all of our business was done at the time, the high prices charged by plaintiffs and the over[-]shipments." (*Id.*) Doral requested that plaintiffs take back the merchandise sitting in South America, but after speaking with Al Sayegh, Mahmood allegedly informed Schwimmer that plaintiffs could not take the merchandise back, that he should sell it "at any cost," and that "plaintiffs would cover Doral's losses." (*Id.*) Doral apparently did so, incurring losses amounting to approximately $4 million. (*See* Fleischman Decl. ¶ 8.)

The parties' situation apparently did not improve, and another meeting was held in September of 1998. The meeting was attended by Leiser Schwimmer; Bernard Schwimmer; Abe Wercberger ("Wercberger"), Doral's Director of Sales; Mahmood; and two other employees of plaintiffs. The end result of the meeting was an agreement (the "Agreement") which is at the heart of this lawsuit. The Agreement, which is entitled "Minutes of Meeting Held in the Office of Doral Trading on the 10th of September, 1998 in Brooklyn, USA," states as follows:

The following were discussed and agreed:

1—The total out-standing [*sic*] amount which M/S Doral Trading has to pay to Vision and/or Al Sayegh Brothers Trading is as of September 10th, 1998.

| | |
|---|---|
| Out-standing [*sic*] as per the statement of Al–Sayegh | $2,468,159.00 |
| Add: Out-standing [*sic*] Un-released Containers | $ 927,210.00 |
| Less: Telephones returned | $ 73,664.00 |
| Less: Discount for total price differences | $ 400,000.00 |
| Total net out-standing [*sic*] | US$2,921,705.00 |

2—M/S Doral Trading agreed to pay the above out-standing [*sic*] as under:

| | |
|---|---|
| —Within one week from today | US$1,000,000.00 |
| —Within one month from today | US$ 943,105.00 |

. . . . .

5—To cover-up the loses [*sic*] incurred by both firms—Al–Sayegh/Vision and Doral Trading—boh [*sic*] agreed to work with Aiwa in the future for the stock lots and close out deals. This way we can have better with [*sic*] Aiwa to improve our Gross Profit.

(3/19/02 Calinoff Aff.Ex. F.) The agreement is signed by Schwimmer, Wercberger, and Mahmood. (*See id.*) As can be seen, while Doral acknowledged in the Agreement that it owed approximately $2.9 million to plaintiffs, the Agreement only discusses the payment of approximately $1.9 million to them, leaving a question as to plaintiffs' right to collect the remaining $1 million balance.

Not surprisingly, the parties' interpretations of the Agreement differ. Defendants argue that, in executing the Agreement, plaintiffs were giving up their right to recover the $1 million left outstanding under the terms thereof, the idea being that the parties would work out their problems and continue their relationship, which would allow plaintiffs to recoup their $1 million "loss" from future profits generat-

ed by their dealings. (*See* 4/26/02 L. Schwimmer Decl. ¶ 10.) According to defendants, this is confirmed by the Agreement's express recognition of "the losses incurred by both firms." Defendants argue that this language suggests that plaintiffs were foregoing their claim to the remaining $1 million, because if they were not, then plaintiffs would have been entitled to full repayment, and could not have actually incurred any "losses." (*See* Def. SJ Opp. at 12.)

Plaintiffs, on the other hand, argue that they never agreed to waive the $1 million outstanding balance, and instead simply agreed to delay receiving payment of this amount until defendants were in a better financial position. Plaintiffs argue that numerous letters between the parties subsequent to the execution of the Agreement confirm that their interpretation of the Agreement is correct. (*See* Pl. SJ Mem. at 5–12.) Indeed, a number of letters were exchanged between the parties after they entered into the Agreement. In those letters, plaintiffs repeatedly demanded payment of the $1 million, and defendants continually refused to pay.

In light of the ongoing dispute concerning the $1 million, the parties met once more at Doral's office in Brooklyn, on May 11, 1999. At that meeting—which was attended by Schwimmer, Wercberger, and Mahmood—the parties proposed entering into a joint venture for the distribution of electronics. After the meeting concluded, Mahmood apparently faxed a draft of the meeting's minutes to Schwimmer for his signature and approval, as well as the signature of Wercberger. (*See* 4/26/02 Schwimmer Decl.Ex. E.) The minutes provided the following:

The following were discussed and agreed upon;

—The total out-standing [*sic*] amount which M/S Doral Trading and/or L.S. Electronics Co. has to pay to Vision and/or Al Sayegh Brothers Trading is as of 11th May, 1999 is [*sic*] as under;

| | |
|---|---|
| Out-standing [*sic*] as per the statement of Al–Sayegh | $1,444,306.50 |
| Add: Out-standing [*sic*] of unreleased containers | $ 302,100.00 |
| Total net out-standing [*sic*] | US$1,746,406.50 |

—M/S Doral Trading/L.S. Electronic Co. agreed to settle the above out-standing [*sic*] as under;

| | |
|---|---|
| —Transfer within today | $100,000.00 |
| —Ship back the unreleased containers | $302,100.00 |
| —Telex Transfer with [*sic*] 10 days from today | $344,306.50 |

. . . . .

—Both Mr. Abe and Mr. Leiser are of the opinion that Aiwa Panama prices are unbeatable and are cheapest in the world. The other advantage of buying from Aiwa Panama is the shortest delivery period—one week from the order confirmation date[, w]hile from Dubai it takes more then [*sic*] 6 to 8 weeks for the container to arrive at any South American Port. Mr. Leiser gave the following proposal while discussing the possibility of as how [*sic*] we can purchase the product directly from Aiwa Panama,

1—Make a joint venture company in USA with the following persons as share holder [*sic*] of the company;

 —Mr. Abdul Jabbar Al–Sayegh

 —Mr. Leiser Schwimmer

 —Mr. Abe Wercberger

. . . . .

6—Mr. Leiser to prepare a corporate feasibility study for the project & fax the same to Dubai within 10 days from today's date for discussion and approval from the Board.

(*Id.*) Schwimmer and Wercberger signed the minutes, but Mahmood never did. The

parties never entered into a joint venture, and their relationship then collapsed.

On July 6, 2000, plaintiffs commenced this action against Doral, Regal and Schwimmer, alleging two causes of action: breach of contract (count one) and account stated (count two). Doral counterclaimed against plaintiffs, seeking to recover the losses it sustained when it sold the merchandise lying in port in South America. In addition, each of the defendants raised affirmative defenses including, *inter alia*, novation and accord and satisfaction.

Plaintiffs now move for summary judgment on their two claims. In essence, plaintiffs argue that defendants acknowledged they owed $1 million to plaintiffs in the Agreement, and that defendants cannot prove that any of their affirmative defenses have merit. (*See* Pl.Mem. at 4–17.) In opposition, defendants argue that they have proved each of their affirmative defenses, or, alternatively, that there are fact questions regarding their affirmative defenses such that summary judgment is inappropriate. (*See* Def.Opp. at 9–21.)

In addition, Regal and Schwimmer have cross-moved for summary judgment, arguing that there is no legal basis upon which they may be held liable for the $1 million allegedly outstanding. (*See* Def.Mem. at 7–10.) Plaintiffs oppose Regal and Schwimmer's motion, asserting that (i) Regal should be liable because it conducted business jointly with Doral, and (ii) the Court should pierce the corporate veil to hold Regal and Schwimmer liable for Doral's debt to plaintiffs. (*See* Pl.Opp. at 3–16.)

### DISCUSSION

I. *Standard for Summary Judgment*

Summary judgment "shall be rendered forthwith if the pleadings, depositions ...

together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks and citations omitted). In deciding a summary judgment motion, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

II. *Plaintiffs' Motion Must Be Denied Because There Are Factual Questions Concerning Whether Defendants Can Establish An Accord And Satisfaction*

Plaintiffs' case turns on the answer to one question: in the Agreement, did plaintiffs give up their right to recover the $1 million balance owed to them? If they did, then defendants can establish their defense of accord and satisfaction.[2] The

2. "An agreement of one party to give, and another party to accept, in settlement of an

existing or matured claim, a sum or perfor-

Agreement is not clear in this respect. On one hand, the Agreement explicitly states that Doral "ha[d] to pay" approximately $2.9 million to plaintiffs, suggesting that plaintiffs intended to collect the entire amount. On the other hand, the Agreement states that Doral "agreed to pay the above out-standing [sic]," i.e., the $2.9 million, by tendering only $1.9 million to plaintiffs. By making no mention of the remaining balance of $1 million, it is unclear whether plaintiffs agreed to give up their right to collect that sum, or simply agreed to postpone collecting the money without giving up their right to it.

 This ambiguity in the language of the Agreement—an ambiguity which plaintiffs conceded at oral argument—renders summary judgment inappropriate. Under New York law,[3] the question of whether a writing is ambiguous is a question of law for the Court, while the meaning of an ambiguous contract is a question of fact for the factfinder. *E.g., Scholastic, Inc. v. Harris,* 259 F.3d 73, 82 (2d Cir. 2001); *Alexander & Alexander Services, Inc. v. Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). A contract is ambiguous where its terms "suggest more than one meaning when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement." *Scholastic, Inc.,* 259 F.3d at 82; *accord Alexander & Alexander,* 136 F.3d at 86. If the Court finds that a contract is ambiguous, it then looks at any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. *Alexander & Alexan-*

*der,* 136 F.3d at 86. However, in such a situation, "material questions of fact necessarily exist. If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." *Id.* (internal quotation marks and citations omitted); *see also Scholastic, Inc.,* 259 F.3d at 83 ("Only in the rare case is the extrinsic evidence so one-sided that no reasonable factfinder could find to the contrary, in which event the court should resolve the ambiguity as a matter of law.").

 Here, the Agreement makes no reference to the $1 million balance, and its terms, objectively viewed (and drawing all inferences in defendants' favor), could lead a reasonably knowledgeable person to conclude that plaintiffs gave up their right to the remaining $1 million. Furthermore, this ambiguity is not cleared-up by the parties' interpretations of the Agreement, nor by their subsequent courses of conduct. Schwimmer testified that he interpreted the Agreement to mean that plaintiffs were giving up their right to the $1 million, in light of the fact that they had caused significant losses to Doral, and that the $1 million would only be recouped through profits on future business dealings. (*See* L. Schwimmer Dep. at 97–98 ("Q: Is there any mention of the remaining $1 million [in the Agreement]? A: Only through future business."); *id.* at 100 ("A: ... The bottom line [is that] Al Sayegh realized the situation and gave us the extended million dollars to be paid only

mance other than that to which he believes himself entitled, is an accord. The execution of the agreement is a satisfaction." *May Dep't Stores Co. v. Int'l Leasing Corp.,* 1 F.3d 138, 140 (2d Cir.1993).

**3.** The parties do not argue that any other law applies, and discuss only New York law in

their papers. This is a sufficient reason for the Court to apply New York law. *See, e.g., Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir.1998); *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997).

through fresh business."); *id.* at 102 ("A: ... we agreed that both firms by buying new deals will recuperate the million dollars and do[ ] more business, which we tried."); *see also* 4/26/02 L. Schwimmer Decl. ¶ 10 ("Out of the $2.9 million, Doral would pay $1.9 million within one month. There was no obligation to repay the remaining $1 million. This was due to the fact that plaintiffs were responsible to a great extent for Doral's losses. The remaining $1 million was expressly recognized as 'losses incurred by both firms,' . . . . The concept was to allow future business to generate enough profits for all of the parties to cover their losses from past transactions.").)[4] Al Sayegh testified, however, that plaintiffs only agreed to postpone asking for the $1 million balance, and that it was intended to be repaid at a later date. (*See* Al Sayegh Dep. at 90–92.) The parties' correspondence subsequent to executing the Agreement also is unclear with regard to the $1 million. (*Compare* 3/19/02 Calinoff Aff.Ex. K ("It was clearly understood that not only will you wait with this amount until we sell the new merchandise, moreover the profits I will make on the new merchandise will help pay this balance . . . . I believe that it was made clear the amount of one million dollars was put aside only for the old merchandise . . . .") *with id.* Ex. M (requesting Doral to send plaintiffs a letter acknowledging the $1 million debt).)[5]

■ In addition, the evidence indicates that Mahmood, plaintiffs' agent, drafted the Agreement. (*See* L. Schwimmer Dep.

at 70 ("Q: And do you know who prepared these minutes of this meeting? A: This was typed through Sajid, the manager from Al Sayegh.").)[6] The law is clear that ambiguities in a written contract are to be construed against the drafter, plaintiffs in this case. *E.g., McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("equivocal contract provisions are generally to be construed against the drafter") (citations omitted); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir.2000).

For these reasons, the Court denies plaintiffs' motion for summary judgment, as genuine factual questions exist concerning whether plaintiffs intended to forego collecting the $1 million balance left open by the Agreement.

### III. *Schwimmer and Regal's Cross–Motion*

Schwimmer and Regal have cross-moved for summary judgment, arguing that there is no basis to hold them liable on plaintiffs' claims. They are correct, as set forth below, and thus their motion is granted.

#### A. *Schwimmer*

Schwimmer argues that he was never a party to an agreement with plaintiffs and that he never personally ordered merchandise from plaintiffs, and thus plaintiffs cannot hold him liable for the outstanding $1 million. (*See* Def.Mem. at 7–9.) Schwimmer also argues that there is no basis to pierce the corporate veil and hold him

---

4. This interpretation is in accord with the minutes of the parties' May 11, 1999 meeting, from which it appears that plaintiffs were willing to leave $1 million uncollected, and in which plaintiffs appeared willing to enter into a joint venture with Schwimmer.

5. (*But see* 3/19/02 Calinoff Aff.Ex. L (stating that the $1 million balance was to remain "pending").)

6. Plaintiffs baldly assert in their Reply Memorandum that the Agreement was drafted by defendants. (Pl. Reply at 4.) Plaintiffs point to no evidence to support this assertion, and it is contradicted by the testimony of Schwimmer.

answerable for the debts of Doral. (*See id.* at 9–10.) In response, plaintiffs raise two arguments. First, they contend that Schwimmer agreed to be personally responsible for Doral's debts. Second, they argue that "Schwimmer used the corporate form to mislead its creditor, Al Sayegh, and accordingly, the corporate veil should be pierced and Leiser Schwimmer held personally liable." (Pl.Opp. at 11–15.) Plaintiffs' arguments are unpersuasive.

As to plaintiffs' first argument, New York law is clear that "a corporate officer is not normally liable in his or her own personal capacity on contracts executed on behalf of the corporation unless the officer expresses some intention to be bound." *W. Joseph Mcphillips Inc. v. Ellis*, 278 A.D.2d 682, 683, 717 N.Y.S.2d 743, 744–45 (3d Dep't 2000) (citations omitted); *accord Westminster Constr. Co. v. Sherman*, 160 A.D.2d 867, 868, 554 N.Y.S.2d 300, 301 (2d Dep't 1990). Here, plaintiffs point to two facts which allegedly support their argument that Schwimmer did, in fact, express an intention to be personally liable for Doral's debts: (i) a conversation between Schwimmer and Al Sayegh, in which Schwimmer allegedly told Al Sayegh that "he would be personally responsible for" Doral's debts (*see* Pl.Opp. at 14), and (ii) an August 13, 1999, letter from Schwimmer to Al Sayegh in which Schwimmer stated:

> In answer to your request to make a schedule paying the $1,000,000.00, as [I] explained to you that when ever [*sic*] I give my word to do something[,] I am responsible to keep it. I cannot promise a think [*sic*] when I still don't know how to do it. Up until now I stayed behind every word I promised[;] that is what keeps me from promising the impossible.

(3/19/02 Calinoff Aff.Ex. L; *see also* Pl. Opp. at 14). Neither is an acceptable reason for the Court to impose personal liability on Schwimmer.

■ Schwimmer's oral statement that "he would be personally responsible" for Doral's debts is an insufficient basis upon which the Court can impose personal liability, because the statement does not satisfy the Statute of Frauds. Under New York General Obligation Law § 5–701(a)(2), an agreement "to answer for the debt, default or miscarriage of another person" must be in writing. Schwimmer's statement fails to satisfy this requirement, and therefore cannot be utilized by plaintiffs to hold Schwimmer liable for Doral's debts. *See, e.g., PSI Int'l, Inc. v. Ottimo*, 272 A.D.2d 279, 280, 708 N.Y.S.2d 100, 101 (1st Dep't 2000) (corporate officer's assurance that he would never "stick [plaintiff] for the money" loaned by plaintiff to corporation unenforceable under § 5–701(a)(2); officer properly dismissed); *Karl Ehmer Forest Hills Corp. v. Gonzalez*, 159 A.D.2d 613, 553 N.Y.S.2d 22, 23 (2d Dep't 1990) (same).

Nor is the August 13, 1999, letter a sufficient basis to hold Schwimmer personally responsible for Doral's purported debt to plaintiffs. Simply put, even a generous reading of this letter does not suggest that Schwimmer "explicitly" intended to be personally responsible for Doral's obligations. *See Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F.Supp.2d 559, 582 (E.D.N.Y.2002). Indeed, nothing in the letter suggests that it was written in Schwimmer's personal, rather than his representative, capacity, and furthermore, such a conclusion is undercut by the fact that the letter is on Doral stationery.

■ Plaintiffs' second argument—that the Court should pierce Doral's corporate veil and reach through to Schwimmer—also does not survive scrutiny. In order to pierce the corporate veil and hold a corporate officer liable for the debts of a corporation, the party seeking to pierce the

corporate veil must show that (i) the owner exercised complete domination over the corporation with respect to the transaction at issue, and (ii) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) (citing *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810–11, 623 N.E.2d 1157 (1993)). "While complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required." *Id.* (quoting *Morris*, 82 N.Y.2d at 141–42, 603 N.Y.S.2d at 811, 623 N.E.2d 1157). Under New York law, courts must be "extremely reluctant" to disregard the corporate form and pierce the corporate veil. *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 109 (2d Cir.2000).

■ Even assuming *arguendo* that plaintiffs have established that Schwimmer dominated Doral, plaintiffs have utterly failed to adduce any evidence to show that Schwimmer used that domination to commit a fraud or other wrong on plaintiffs. Indeed, plaintiffs blithely assert that Schwimmer used Doral to "mislead" Al Sayegh, but they in no way specify how they were allegedly misled.[7] Furthermore, these allegations are undermined by the fact that plaintiffs have not asserted any claims for fraud or misrepresentation against the defendants. Simply put, there is nothing in the record to suggest that Schwimmer "misused the corporate form for [his] personal ends so as to commit a

fraud or wrongdoing or avoid any of [his] obligations...." *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 340, 680 N.Y.S.2d 891, 893, 703 N.E.2d 749 (1998).

■ The main thrust of plaintiffs' piercing the corporate veil argument appears to be that Doral was "severely undercapitalized." However, this fact, standing alone, is an insufficient reason to pierce the corporate veil. *See, e.g., Gartner v. Snyder*, 607 F.2d 582, 588 (2d Cir.1979) ("Although Enterprises was thinly capitalized, that alone is not a sufficient ground for disregarding the corporate form."); *McDarren v. Marvel Entm't Group, Inc.*, No. 94 CIV 0910, 1995 WL 214482, at *9 (S.D.N.Y. Apr. 11, 1995) ("under New York law, undercapitalization alone is insufficient to pierce the corporate veil"); *Primex Plastics Corp. v. Lawrence Prods., Inc.*, No. 89 CIV 2944, 1991 WL 183367, at *6 (S.D.N.Y. Sept. 12, 1991) (same); *Oriental Commercial & Shipping Co., Ltd. v. Rosseel, N.V.*, 702 F.Supp. 1005, 1020 (S.D.N.Y.1988) (same).

Accordingly, there is no basis for imposing personal liability on Schwimmer, and his cross-motion for summary judgment is granted.

### B. *Regal*

Like Schwimmer, Regal argues that it cannot be held liable because plaintiffs' claims relate only to merchandise shipped to Doral. In response, plaintiffs argue that Regal may be held liable because (i) Doral and Regal used the same trade name, confusing plaintiffs and leading them to believe they were dealing with one entity (*see* Pl.Opp. at 3–5), and (ii) Doral

---

**7.** Plaintiffs do assert that Schwimmer's purported "personal" assurances of payment, as described above, misled them because the assurances "persuad[ed] Al Sayegh to continue extending credit to the defendants." (Pl.Opp. at 14.) This argument is a red herring. The $1 million plaintiffs seek in this lawsuit allegedly came due long before Schwimmer ever gave plaintiffs the so-called "guarantees" of payment; thus, the assurances have nothing to do with the claims raised in this case.

and Regal "acted as one" corporation, and therefore the corporate veil should be pierced (*see* Pl.Opp. at 5–11). Once again, plaintiffs' arguments fail.

To support their "same trade name" argument, plaintiffs rely on *In re Bagel Brothers Bakery & Deli, Inc.*, 264 B.R. 260 (Bankr.W.D.N.Y.2001), a case from the United States Bankruptcy Court for the Western District of New York. In *Bagel Brothers*, two brothers operated a number of bagel shops under the name "Bagel Brothers." Each shop was separately incorporated—the Bagel Brothers store located on Elmwood Avenue was incorporated as Bagel Brothers Elmwood, Inc., for example—and each kept its own books and records. However, each was owned, either directly or indirectly, by one of the two brothers, and when supplies were delivered to the individual stores, suppliers were told to bill Bagel Brothers's main office in Buffalo, New York. When the chain filed for bankruptcy, the Bankruptcy Court found that, despite their separateness, all the corporations doing business as "Bagel Brothers" were liable for the debts of the others, because the overlapping operations between the companies rendered them "a unified *de facto* entity." *Bagel Bros.*, 264 B.R. at 266. Plaintiffs strongly urge the Court to follow the logic employed in *Bagel Brothers*, and hold Regal responsible for Doral's debts because it operated under the same trade name as Doral, namely, L. & S. Electronics.

Plaintiffs, however, neglect to mention that *Bagel Brothers* was reversed on appeal. In fact, Bankruptcy Judge Kaplan's "*de facto* entity" analysis was explicitly rejected on appeal by Judge Curtin. Judge Curtin ruled that the Bankruptcy Court improperly relied "on a theory of corporate liability never recognized by New York courts and supported only by a 120–year–old Supreme Court case dealing with the contractual rights of individual partners in a partnership." *Bagel Bros. Maple, Inc. v. Ohio Farmers, Inc.*, 279 B.R. 55, 67 (W.D.N.Y.2002). Judge Curtin therefore remanded the case to the Bankruptcy Court to apply well-established veil-piercing principles. *Id.* Plaintiffs cite no other authority in support of their "same trade name" argument, and the Court is unaware of any.[8] Accordingly, plaintiffs' argument should be rejected, and Regal's liability examined solely under traditional veil-piercing principles.

■ And, as the discussion above makes clear, Regal cannot be held liable under a theory of piercing the corporate veil. Even assuming plaintiffs have shown that Doral "dominated" Regal, plaintiffs have nevertheless failed to show any wrongful or unjust act committed against them. There has been no fraud committed, nor is there any alleged in the complaint; the essence of plaintiffs' claims is for breach of contract, and plaintiffs have failed to establish that Doral somehow "used" Regal to avoid its contractual obligations to them. *See TNS Holdings*, 92 N.Y.2d at 340, 680 N.Y.S.2d at 893, 703 N.E.2d 749. Plaintiffs offer no proof that Doral transferred

---

**8.** Plaintiffs *do* cite a portion of the Lanham Act for the proposition that "any person who or in connection with any goods or services . . . uses in commerce any word, term, name or any combination thereof . . . which is likely to cause confusion . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." (Pl.Opp. at 5 (citing 15 U.S.C. § 1125(a)(1)).) Plaintiffs reliance on the Lanham Act is mis-

placed. The Lanham Act protects trademarks and other designations of origin from being infringed by third-parties. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 563 (5th Cir.2001) ("The Lanham Act was enacted to provide protection against the unfair and misleading use of another's trademark."). These concerns are not implicated here.

funds to Regal in an attempt to avoid judgment, or that Doral somehow used Regal to obtain goods in order to avoid paying for them. Consequently, Regal's cross-motion for summary judgment is granted, and the claims against it dismissed.

## CONCLUSION

For the reasons set forth above, the Court denies plaintiffs' motion for summary judgment, and grants Schwimmer and Doral's cross-motion.

SO ORDERED.